**UNITED STATES of America**

v.

**Richard F. CAVERLY, Appellant at No. 17002,**

**and**

**James S. Rizek, Appellant at No. 17001 (two cases).**

**Nos. 17001, 17002.**

United States Court of Appeals Third Circuit.

Argued Jan. 21, 1969.

Decided April 8, 1969.

**1314**

Joseph P. Kane, Laster, Strohl, Kane, McDonald, Mattes & Kelleher, Scranton, Pa., for James S. Rizek.

Richard S. Campagna, Scranton, Pa., for Richard F. Caverly.

Julius Altman, Asst. U. S. Atty., Scranton, Pa., for appellee (Bernard J. Brown, U. S. Atty., Scranton, Pa., on the brief).

Before HASTIE, Chief Judge, and McLAUGHLIN and STAHL, Circuit Judges.

## OPINION OF THE COURT

GERALD McLAUGHLIN, Circuit Judge.

Appellants were indicted (April 16, 1964) and convicted (May 5, 1965) of stealing, purloining or converting property of the United States of a value of more than One Hundred Dollars (18 U.S. C. § 641). The property involved consisted of bound volumes of the Congressional Record from its inception to the present time. The volumes had been in the City of Scranton, Pennsylvania, Public Library. The latter at all times pertinent to this appeal was and is a United States Government depository library. The admitted removal of the Congres-

sional Record set and numerous books, documents, pamphlets, etc. from the library took place during the period from January 1961 to approximately November 1961. The trial of defendants-appellants was had in April and May of 1965.[1]

Appellant-defendant Caverly in January 1961 was the librarian of the said City of Scranton, Pennsylvania Public Library and had been so employed since December 1958. Appellant Rizek in January 1961 was a book dealer and, according to him, had been engaged in that business for the twenty years then last past. A witness in his own defense, he admitted that in 1957 he was a book dealer inter alia and that on December 11, 1957 he had been convicted in New Jersey on an indictment containing fourteen counts of embezzlement and two counts of forgery. He was given a sentence of five years imprisonment with the sentence suspended and placed on probation. Within that probationary period, in January 1961, he went to the Scranton Library where he saw and had a talk with appellant Caverly. Both appellants assert that this was their first meeting. The Government proofs strongly indicate that Rizek and Caverly set up their basic scheme of abstracting material from the Scranton library at that time.

Charles O. Venick who was employed by Rizek from March 1961 to September or October 1961, testified at the trial. He said that within those dates he and Rizek, and sometimes other employees also, "went to the Scranton library several times." He had nothing to do with any arrangements between Rizek and Caverly. He was just told by Rizek "what titles and material to put on the station wagon or trailer or truck." He said that Rizek told him that Caverly was a "prostitute" and that "he felt he could take Caverly for anything he wished to and he would pay Caverly with his check and what Caverly did with the money was no concern to him because

---

1. The jury was unable to reach unanimous verdicts on the first five counts of the in-

dictment. At a subsequent trial of these the defendants were acquitted.

once he was paid the title was our material." Venick, speaking of a particular trip he and Rizek made to the Scranton library reference room, said that on the way there Rizek told him they "were going into the reference room to pull some material and it would be a good day because the reference librarian would not be there that day." Venick asked Rizek how he knew that and Rizek answered "Mr. Caverly informed him." Venick said the material they loaded was made up of "Government documents, periodicals, reference materials, some books and that's it—some maps." Explaining his status with Rizek, Venick testified, "Well, I was an employee of Rizek's but I was fronting Raritan Book Company for him because he was unable to sell any books." The material Venick took from the library on the trips he named he brought to a warehouse and office in New Brunswick, New Jersey, the rent of which was paid by Rizek.

Immediately following that first talk between Rizek and Caverly, the latter introduced Rizek to Mrs. Hopkins the assistant reference librarian and perhaps Miss Rice, the reference librarian.[2] Mrs. Hopkins was asked if "At that meeting you were given any instructions by Mr. Caverly?" She answered:

> "Well, Mr. Caverly told us that Mr. Rizek was going to be in the Library and he would be going through our stacks and he was going to take some materials not needed by the Library or that we wouldn't use, and he also told us that Mr. Rizek would take some of our bound periodicals and he would have them returned on microfilm."

Mrs. Hopkins testified that Rizek removed books and other materials from the library starting in January 1961 and until November 1961. According to her the first few times Rizek took away library material he had a U-Drive-It truck. She was questioned whether at that time the library had a copy of the Government regulations concerning Government documents, including the Con-

gressional Record. She answered that the library did have a copy of the regulations in pamphlet form. She identified the pamphlet shown her as the library copy of said regulations and it was marked in evidence as Government Exhibit 2. The witness told that she had complained to the library trustees in April of 1962 about the removal of books and that they had not been replaced by microfilm. On cross-examination Mrs. Hopkins was asked "But you didn't find it necessary to go to a member of the Board of Trustees until April 1962?" She answered "I didn't find it necessary because I was hoping that Mr. Caverly and Mr. Rizek would do as they had promised. Q. What had they promised? A. They promised that the material would be returned on microfilm."

Miss Cresswell, the cataloguer of the library throughout the involved period, had been employed at the library since 1925. She testified that during the time Rizek was removing books from the library, those books were never checked out with her in accordance with the necessary processing of the library books which was the only method the library had of keeping track of them. She said she had "Asked Mr. Caverly on several occasions for a list of the books which were being removed from the Library, he always promised, and I never received any list which would indicate to me what books were being taken from the library."

Miss Cresswell thoroughly explained the library inventory card index system which was kept by her. She repeated that none of the books and other material taken by Rizek was ever checked out through the library card inventory system. She identified Government Exhibit #3 as "the card record of the Congressional Record, Annals of Congress, Congressional Globe, which were the predecessors of the Congressional Record, which the Library received from the government as a government depository and which we recorded as we received them

---

2. Miss Rice died prior to the trial and Mrs. Hopkins became reference librarian.

on these cards." From those cards Miss Cresswell in 1962 "was able to make a report in the inventory that these books were missing from our shelves." The witness did not pretend to have actual knowledge of the date of receipt of the 1839, 1840 Congressional Globe volumes. The Scranton library was built in 1891 approximately. She thought those books were received in the early days of the library as a government depository. Regarding the library's Congressional Records the witness repeated on cross-examination in effect her statement on direct examination saying that "Our Congressional Records, to my knowledge, were only received as a depository. * * * They were part of our documentary collection * * * were kept as the Government depository collection—as a collection." Those volumes were on the library identification cards and as to them Miss Cresswell stated "I can say from our cards they were part of our collection."

It should be specifically stressed that Miss Cresswell in addition to her own vital first-hand knowledge of the Congressional Record volumes which had been in the library, testified from the authentic, carefully kept business records of the library which unmistakably and properly established said volumes as Government depository material.[3]

Mr. H. W. Buckley, Superintendent of Documents of the United States Government Printing Office since July 1953, was a most important witness. He stated that federal depository libraries came under his jurisdiction and that the Scranton library is a Government depository. Such a library "is eligible to receive copies of United States government publications for the convenience of the public." With respect to the documents furnished such library at its request, he said:

"They are distributed to that library but under the provision of the law that they are not given to the library

---

3. There was testimony of other library employees which strongly corroborated the Government proofs generally. Mrs. Lapsansky. in charge of the Scranton library circulation department in 1961, was a trial witness. She was introduced to Rizek by Caverly prior to February 15, 1961. Caverly indicated to her that Rizek "was to be going through our stacks taking certain materials and that he was authorized to do so." She "noticed certain materials gone immediately after his passing through departments. I did see other materials actually being loaded into a box." On that occasion a man with Rizek was packing books into a box. Mrs. Lapsansky picked up one of the books to see if the circulation record had been removed and the man said to her "Don't touch those. They are ours." She asked Mr. Caverly to show her "the records from the books before they were submitted to the Catalogue Department for processing—discard processing." Caverly promised that she would see them but never gave her that information. She prepared a list of books missing from her department and gave it to Caverly. Mrs. Lapsansky on the witness stand carefully pointed out the great difference between library owned books and those deposited by the Government.

Mrs. Munchak, the librarian at Scanton Green Ridge branch library since 1954, testified that Caverly introduced her to Rizek in the spring or summer of 1961. Caverly told her that he and Rizek were going to look at the library books in the basement and upstairs, which they did. Caverly said they were going to take the books which were in the basement. Risek's men did come at least twice and did remove those books which were "House and Senate Reports, the government documents."

The assistant librarian, Mrs. Hungerbuhler, as a witness said she had been employed by the Scranton library for the last seventeen or eighteen years; that during the period "from about February 1961, I think until perhaps the Spring of 1962" she saw Rizek in the library upon numerous occasions. On one occasion she saw both Rizek and Caverly together in the library after hours. It was very late in the evening and she was standing outside the library waiting for her husband to call for her. Rizek and Caverly came to the library in a truck which stopped in front of the library. The witness also told of receiving calls from the City of Troy library regarding books Rizek was negotating for on behalf of the Scranton library.

in as much as all depository publications remain the property of the Government."

Mr. Buckley said the 1955 edition of rules and regulations for the disposal of public documents to Depository Libraries was in effect during 1961. He identified a copy of the 1955 edition which was Government Exhibit 2. He stated that under those rules a depository library needed the permission of his office to dispose of bound volumes of the Congressional Record. He recognized Government Exhibit 55 as a letter from Caverly to his office dated September 18, 1961. Caverly there claimed it was the third time he had written concerning the disposition of:

"* * * an excessive number of volumes of miscellaneous government documents which we are no longer able to house. Unless I hear from you by return mail as to some manner of disposition of these volumes, I shall then undertake to package and ship to you in Washington such volumes as I cannot adequately house.

"I would be able to utilize much of this bulk in an exchange program that would benefit this Library."

Mr. Buckley answered that letter by Government Exhibit 56 dated September 25, 1961 which reads:

"Thank you for your letter of September 18, 1961.

This Office finds no trace of any previous letters from you in regard to disposition of publications.

As a depository library someone in your organization is no doubt familiar with depository matters including our instructions regarding what may and may not be disposed of by a library. For your convenience we enclose a copy of our Cumulative Instructions in which these are contained.

You will note in these instructions that lack of space is not a valid reason for disposing of publications. It may be, however, that many of these publications you refer to are in series no longer being received by your library.

In these cases we usually grant permission for disposal but we do not give carte blanche permission. You should send us a list showing three things for each series or group: the current depository item number, the series or group title, and the approximate extent of your holdings. We can then determine which you may dispose of and which should be kept.

We hope to have served you with this information."

Mr. Buckley was asked "if permission is granted to sell these government documents of the depository library, what happens to the proceeds?" He answered:

"Wherever we grant permission to dispose of a depository publication we specify that it may be disposed of to another library, to some educational institution or, failing in that, in any other manner desired, but that if the disposition takes the form of a sale the proceeds of the sale with a letter of explanation must be turned over to our office in order that we can deposit the proceeds in the United States Treasury."

Mr. Buckley stated that microfilming of Government documents might be permitted but he again stressed that "* * * government documents may not be disposed of in any manner without the written authorization of the Superintendent of Documents."

The witness made it very clear that by 44 U.S.C.A. § 183, "The Public Printer shall furnish the Congressional Record as follows and shall furnish gratuitously no others in addition thereto. * * * In addition to the Congressional Record shall also be furnished as follows: * * * To the Superintendent of Documents, as many daily and bound copies as may be required for distribution to depository libraries * * *." The statutory foundation for the Instructions is found in 44 U.S.C.A. § 92 which reads:

"* * * Government publications furnished depository libraries shall be

made available for the free use of the general public and must not be disposed of except as the Superintendent of Documents may direct."

The legislative history re depository libraries 1962 U.S.C., Congressional and Administrative News, 2104 to 2120, at page 2107 is most helpful:

"Publications selected by depository libraries, although permanently deposited with them, remain the property of the U. S. Government and may not be disposed of without the permission of the Superintendent of Documents * * *."

Mr. Buckley stated that there was no requirement that Government depository material in a depository library be stamped "Property of the United States" or any similar marking. As Superintendent of Documents he said the authority derived from not only the above referred to statute but from Government practice thereunder for at least the entire thirty-eight years he had been connected with the Government Printing Office. He repeated that Government publications furnished on a depository basis to depository libraries "shall not be disposed of except as the Superintendent may direct."

Both defendants were witnesses. Rizek led off with a glib story of his taking a substantial number of valuable books and other material from the Scranton library and went on for 185 pages of the trial transcript in his wordy effort to play down and excuse his masterminding of the "stealing, purloining or converting" the Scranton library books including its Congressional Record set. In all of that testimony and in all of Caverly's evidence there is not one word spoken or written by either of them to indicate that Caverly had any *right* to allow Rizek to go through the library, strip it of whatever material he wished and ostensibly pay Caverly by check to the latter's personal order in whatever sum he wished and so provide a so-called protecting cover for the barefaced stealing from the city library. Nor is there evidence from either of those defendants that Rizek ever informed Caverly fully of the material he took. It is glaringly obvious that Rizek, a professional book buyer and seller for twenty years prior to 1961, knew that Caverly had not advised the responsible heads of the library, the trustees, of what was going on. Indeed until Mrs. Hopkins in the spring of 1962 notified the president of the trustees, the latter never had the slightest inkling of what was going on. Caverly in the course of his testimony never once claimed to have sold any property of the Scranton library under any circumstances whatsoever prior to this sorry affair. Under oath he admitted that he had neither written nor oral authority from the trustees to buy, sell or trade library material. The checks, such as they were, which Rizek deliberately made out to Caverly were never turned over to the library. Rizek, as plainly indicated by what he told his man, Venick, figured it would be that way from the beginning. He actually knew the fact because he received his cancelled checks which had been deposited in Caverly's personal account. In the face of Caverly's own statement that he had no authority to buy, sell or trade library property on his own, he and Rizek produced some testimony apparently in an attempt to show perhaps sort of a trade custom regarding a librarian's authority. Ill-advised as it was, it did not encompass the patent crime committed in this instance by Rizek and his willing collaborator. Nor did it generally or specially weaken the unavoidable admissions of Caverly that he in the Scranton library did not possess such authority.

Caverly on the stand did not deny that the Congressional Record involved was the property of the United States. Affirmatively he knew it was Government property. His letter of September 18, 1961 to the Superintendent of Documents above quoted asked for instructions as to "the disposition of an excessive number of volumes of miscellaneous government documents" and stated that he will send these to the Superintendent

unless he hears by return mail. Then writes Caverly "I would be able to utilize much of this bulk in an exchange program which would benefit the library." Caverly was reminded by the Superintendent that he could not dispose of any Government material without permission of the Superintendent. The latter sent him direct another copy of the "Cumulative Instructions to Depository Libraries". Caverly never returned any Government library matter, including the Congressional Record set, to Washington. The Record and other Government material merely disappeared from the library via Rizek.

Rizek too, for all his voluminous testimony, never once straight-forwardly denied that the Congressional Record volumes at Scranton belonged to the United States. He found fault with the way the library identified its government documents, calling it "a very peculiar system." He said he kept away from books marked "Deposited" but would take that type of books if they were duplicates. There is no evidence in this record that Scranton had duplicate Government books. Despite the fact that the Congressional Record collection amounted to approximately twelve hundred volumes, Rizek did not produce a single volume which was marked "presented to the library" or otherwise designated as a library volume. Above all, in his entire testimony he never mentioned the one library marking which governed the type of possession the library had of its material, i. e. the Congressional Record index card, which plainly noted the depository nature of the library's retention of the Congressional Record set.

The above detailed trial evidence presents substantial proof that the Congressional Record set in the Scranton library had been properly distributed on a depository plan to the latter as a United States depository library. That status was attested to by Miss Cresswell from both personal knowledge and by means of the business records of the library. Mrs. Hopkins of the library staff categorically classified the set as a "Government document." She was familiar with the Instructions of the Superintendent of Documents of the United States Government Printing Office to Depository Libraries under which the Scranton library possessed the said set. As mentioned, under the terms of the deposit collection "Publications supplied to depository libraries, although on permanent deposit, remain the property of the Federal Government and may not be disposed of in any manner without the written authorization of the Superintendent of Documents." The Superintendent of Documents himself stated that the Scranton library was a depository library.

Rizek's whole operations showed his intent to deprive the Government of its property, the Congressional Record set. In his all inclusive protective testimony he shrewdly avoids claiming to have inquired of Caverly regarding the ownership of the set. From his own story he was completely familiar with the source of the Record i. e. the Government Printing Office. From the Scranton Government Documents Collection he could not have avoided the knowledge that the library had the Record set as a Government document. Its official library card so listed the set. The Government instructions regarding it were available at the library to Rizek. Apparently he never bothered to look at them. It can be fairly assumed that he knew generally their content for he asserted he had previously dealt in Congressional Record volumes. He alleged that actually he, himself had at that time at least several volumes of the Congressional Record.

█ The arguments for both appellants center chiefly on the contention that the Congressional Record set was not United States property. The trial evidence as we see it is completely to the contrary. Beyond question the volumes were turned over to the library by their owner the Government. There is substantial evidence that this was on a depository condition which was never withdrawn. Under all the facts and legitimate inferences therefrom Rizek and

Caverly had knowledge of that condition. Despite it, Rizek, with Caverly's complete approval and cooperation removed the volumes and sold them. He may or may not have passed along some of the money he received to Caverly. That is of no fundamental importance here.[4] Nor are any of his various maneuvers to produce a legitimate looking front for this ugly crime. Rizek with Caverly as his willing tool simply stole the Record set. We find not the slightest element of violation of due process here. We find Rizek's intent to be definitely established on the whole evidence.[5] It seems to us while he was an accomplice to Caverly in phases of this offense he was also beyond doubt a principal therein. We have examined the other Rizek points. We find them without merit.

What we have said regarding the assertion that there was insufficient proof to go to the jury concerning the ownership of the Congressional Record by the United States applies just as forcibly to Caverly. The latter's suggestion that the Government failed to establish at least a jury issue re Caverly's intent to convert Government property i. e. the Record set, on all the evidence is totally unjustified.

■ Finally, Caverly argues that he did not have a fair trial because of the publicity attendant upon the investigation of the Rizek-Caverly transactions and the trial thereon. It is the fact that the jury was chosen from a nine county area. Only four of the jurors were residents of Lackawanna County where Scranton is located. The record of this trial from the selection of the jury to the verdicts themselves evidences the utmost care by the trial judge to insulate the jury from all possible sources of outside information regarding the trial, the defendants, and every person and thing not emanating from the trial itself. General mention is made that "trials are not to be won or lost through the use of radio, television and newspapers." The experienced judge in charge of this trial, from the beginning stressed constantly to the jury to have nothing to do with those or other news media, not to talk about the case at all with anyone. The cold record itself indicates that the court's sharply pointed warnings were effective. We do not find the slightest hint that Caverly was not tried "in an atmosphere undisturbed by public passion or emotion."

Let it be said in conclusion that there was no mystery, no hidden charms as these cases were developed before the jury. The paramount issue was credibility. The Government produced solid proofs under Counts VI and VII of the Indictment which if believed fairly warranted the jury finding defendants

---

4. The library never received any money from Rizek or Caverly. None of the material taken from the library by Rizek was ever microfilmed. During at least the year after Caverly's last dealings with Rizek, Caverly's only excuse for not having any of the removed materials microfilmed was that he had suggested to Mrs. Hopkins two or three times in passing, "Dorothy, let's get that list turned in." He was asked if Mrs. Hopkins ever compiled the list of the library materials to be microfilmed. He answered "Not to my knowledge." It will be remembered tha Caverly was still the head of the library throughout that year.

There is considerable testimony in the record from both Rizek and Caverly of comparatively large sums of money borrowed and lent between the two of them. Also of trips taken by them to the Carib-

bean and the like. There is no need of going into those drab sequences at length.

5. The very opinions cited by appellants re lack of proof of their intent to convert, Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952) and Mitchell v. United States, 129 U.S. App.D.C. 292, 394 F.2d 767 (1968) both point out that where as in this appeal there are sufficient facts of property ownership the jury may find that the intent to convert did exist. As Mitchell holds, p. 774: "We emphasize, however, that this element of the crime (scienter) may be shown either by specific knowledge of District of Columbia ownership or by the establishment of sufficient facts to put a reasonable person on notice of the District ownership. This is the generally accepted interpretation of the scienter requirement in such statutes."

guilty. The jury simply did not believe Rizek and Caverly as they tried at great length to talk their way out of responsibility for the results of the sordid scheme Rizek had rigged up with Caverly's all too willing connivance. The jury did believe Venick, those decent, long term library employees, and Superintendent Buckley.

The judgments of conviction in these appeals will be affirmed.

We are grateful to appellant Rizek's assigned counsel for his thorough, able representation of his client.