UNITED STATES of America,
Plaintiff-Appellee,

v.

Cecil Dwayne EVANS, Arnold Gene
Tate, and Charles Edward Gent,
Jr., Defendants-Appellants.

No. 76–3715.

United States Court of Appeals,
Fifth Circuit.

May 4, 1978.

Rehearing and Rehearing En Banc
Denied June 16, 1978.

Morris Jackson Hampton, Dallas, Tex., for Evans.

Jay J. Madrid, Dallas, Tex. (court-appointed), for Tate.

Kevin J. Clancy (court-appointed), David A. Donohue, Dallas, Tex. (Co-Counsel), for Gent.

Kenneth J. Mighell, U. S. Atty., Fort Worth, Tex., Judith A. Shepherd, Robert C. Prather, Asst. U. S. Attys., Dallas, Tex., Nash W. Schott, Atty., U. S. Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before THORNBERRY, Circuit Judge, and SKELTON, Senior Judge *, and HILL, Circuit Judge.

JAMES C. HILL, Circuit Judge:

The six defendants in this case were charged in a complex sixteen count indictment. The trial lasted three weeks. On this appeal, three of the defendants, appellants, raise twenty-one separate points of error based on a transcript of over four thousand pages and a record of over one thousand one hundred pages. The exhibits entered into evidence were virtually too numerous to count. Faced with this extensive record and complex appeal, we shall begin at the beginning and go on till we come to the end; then affirm in part and reverse in part.[1]

### I. PROCEDURAL HISTORY

Collegiate Recovery and Credit Assistance Programs, Inc. ("CRCAP"), Cecil Dwayne Evans, Thomas Patrick Foley, III,

---

* Senior Judge of the United States Court of Claims, sitting by designation.

1. "Where shall I begin, please your Majesty?" [the white Rabbit] asked.

"Begin at the beginning," the King said very gravely, "and go on till you come to the end—then stop."

*Lewis Carroll, Alice's Adventures in Wonderland* 106 (1945).

We are greatly aided on this Homeric trek by the briefs in the instant case that provide guidance through the record on appeal. We are appreciative of the efforts of the attorneys and commend them for a job well done.

Charles Edward Gent, Jr., Gene Allen Miller, and Arnold Gene Tate were named as defendants in a sixteen count indictment filed in the United States District Court for the Northern District of Texas· on June 3, 1976.[2]

Count one charged all the named defendants with having conspired to commit offenses in violation of Title 18, United States Code, Sections 201, 371, 641 by causing irregularities in the practices of the Office of Education, United States Department of Health, Education and Welfare and in the collection by CRCAP of delinquent student loans, which had been made pursuant to programs administered by the Office of Education.[3] The conspiracy was alleged to have continued from June 29, 1970, until the date of the return of the indictment.

2. The June 3, 1976, indictment superseded a seven count indictment filed on March 30, 1976, which had named only Tate and Evans.

3. 18 U.S.C.A. § 201 provides in part:
*Bribery of public officials and witnesses*
(a) For the purpose of this section: "public official" means . . . an officer or employee or person acting for or on behalf of the United States, or any department, agency or branch of Government thereof . . . in any official function, under or by authority of any such department, agency, or branch of Government . . . and
"person who has been selected to be a public official" means any person who has been nominated or appointed to be a public official, or has been officially informed that he will be so nominated or appointed; and
"official act" means any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in his official capacity, or in his place of trust or profit.
(b) Whoever, directly or indirectly, corruptly gives, offers or promises anything of value to any public official or person who has been selected to be a public official, or offers or promises any public official to give anything of value to any other person or entity, with intent—
(1) to influence any official act; or
(2) to influence such public official or person who has been selected to be a public official to commit or aid in committing, or collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States; or
(3) to induce such public official or such person who has been selected to be a public official to do or omit to do any act in violation of his lawful duty, or
(c) Whoever, being a public official or person selected to be a public official, directly or indirectly, corruptly asks, demands, exacts, solicits, seeks, accepts, receives, or agrees to receive anything of value for himself or for any other person or entity, in return for:
(1) being influenced in his performance of any official act; or
(2) being influenced to commit or aid in committing, or to collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States; or
(3) being induced to do or omit to do any act in violation of his official duty;

. . . . .

Shall be fined not more than $20,000 or three times the monetary equivalent of the thing of value, whichever is greater, or imprisoned for not more than fifteen years, or both, and may be disqualified from holding any office of honor, trust, or profit under the United States.
(f) Whoever, otherwise than as provided by law for the proper discharge of official duty, directly or indirectly gives, offers, or promises anything of value to any public official, for or because of any official act performed or to be performed by such public official, former public official, or person selected to be a public official, or
(g) Whoever, being a public official, former public official, or person selected to be a public official, otherwise than as provided by law for the proper discharge of official duty, directly or indirectly asks, demands, exacts, solicits, seeks, accepts, receives, or agrees to receive anything of value for himself for or because of any official act performed or to be performed by him; . . .

. . . . .

Shall be fined not more than $10,000 or imprisoned for not more than two years, or both.
18 U.S.C.A. § 371 provides in part:
*Conspiracy to commit offense or to defraud United States*
If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.
18 U.S.C.A. § 641 provides in part:

Counts two through seven charged CRCAP and its president, Tate, with misappropriation of student loan money, in violation of Title 18, United States Code, Section 641. Foley, Gent and Miller were charged in these counts as aiders and abettors in violation of Title 18, United States Code, Section 2.[4] Count eight alleged that Miller had accepted a bribe, aided and abetted by Tate and CRCAP, in violation of Title 18, United States Code, Sections 2, 201(c). Count nine charged Miller with the unlawful destruction of government records in violation of Title 18, United States Code, Section 2071(a). Counts ten and eleven charged, respectively, the payment by Tate and the acceptance by Evans of a two hundred dollar bribe in January of 1974, in violation of Title 18, United States Code, Sections 201(b), 201(c). Counts twelve and thirteen charged, respectively, the payment by Tate and the acceptance by Evans of a five hundred dollar bribe in October of 1973 in violation of Title 18, United States Code, Sections 201(f), 201(g). Counts fourteen and fifteen charged, respectively, the acceptance by Evans and the payment by Tate of unlawful compensation in violation of Title 18, United States Code, Sections 203(a), 203(b).[5] The sixteenth and final count of the indictment charged that Evans and Tate, aided and abetted by Gent and Foley, had traveled in interstate commerce to facilitate bribery and attempted bribery in violation of Title 18, United States Code, Sections 2, 1952.[6]

*Public money, property or records*

Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or

Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted—

Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

4. 18 U.S.C.A. § 2 provides in part:

*Principals*

(a) Whoever commits an offense against the United States, or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

5. 18 U.S.C.A. § 203 provides in part:

*Compensation to Members of Congress, officers, and others in matters affecting the Government*

(a) Whoever, otherwise than as provided by law for the proper discharge of official duties, directly or indirectly receives or agrees to receive, or asks, demands, solicits, or seeks, any compensation for any services rendered or to be rendered either by himself or another—

(2) At a time when he is an officer or employee of the United States in the executive, legislative, or judicial branch of the Government, or in any agency of the United States, . . .

in relation to any proceeding, application, request for a ruling or other determination, contract, claim, controversy, charge, accusation, arrest, or other particular matter in which the United States is a party or has a direct and substantial interest, before any department, agency, courtmartial, officer, or any civil, military, or naval commission, or

(b) Whoever, knowingly, otherwise than as provided by law for the proper discharge of official duties, directly or indirectly gives, promises, or offers any compensation for any such services rendered or to be rendered at a time when the person to whom the compensation is given, promised, or offered, is or was such a . . . officer, or employee—

Shall be fined not more than $10,000 or imprisoned for not more than two years, or both; and shall be incapable of holding any office of honor, trust, or profit under the United States.

6. 18 U.S.C.A. § 1952 provides in part:

*Interstate and foreign travel or transportation in aid of racketeering enterprises*

(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

(3) otherwise promote, manage, establish, or carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

(b) As used in this section "unlawful activity" means . . . (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.

Prior to trial, the district court accepted a plea of *nolo contendere* by the corporate defendant, CRCAP; and, defendant Foley entered into a plea bargain to dispose of the charges against him. Defendant Miller proceeded to trial, but during the trial pleaded guilty to a lesser included offense comprehended within the bribery charge of count eight. Both Foley and Miller testified for the government. The remaining defendants, Evans, Gent and Tate, were convicted after a jury trial and have brought this appeal.

Appellant Evans was found not guilty of the alleged conspiracy of count one. 18 U.S.C.A. § 371. On count eleven, he was found not guilty of accepting a bribe under 18 U.S.C.A. § 201(c); but, he was found guilty of the lesser included offense of accepting a gratuity under 18 U.S.C.A. § 201(g). He was convicted on count thirteen for accepting an unlawful gratuity and on count fourteen for accepting unlawful compensation. 18 U.S.C.A. §§ 201(g), 203(a). On each of these three counts, Evans was sentenced to a term of two years imprisonment and a fine of five thousand dollars. Evans was also convicted, under count sixteen, of interstate travel to facilitate the violation of 18 U.S.C.A. § 201, Bribery of public officials and witnesses. 18 U.S.C.A. §§ 1952(a)(3), 1952(b)(2). On that count, he was sentenced to five years imprisonment and a five thousand dollar fine. He was also disqualified from ever holding any office of honor, trust or profit under the· United States. All of Evans' sentences were made concurrent.

Appellant Tate was convicted of the conspiracy alleged in count one and sentenced to five years imprisonment and a five thousand dollar fine. 18 U.S.C.A. § 371. On each of counts two through seven, charging conversion of government property, he was convicted and sentenced to a ten year term of imprisonment and a ten thousand dollar fine. 18 U.S.C.A. § 641. He was convicted on count eight of aiding and abetting Miller

in accepting a bribe and sentenced to ten years imprisonment and a ten thousand dollar fine. 18 U.S.C.A. § 201(c). Tate received the same sentence on his conviction under count ten for bribery of Evans. 18 U.S.C.A. § 201(b). On count twelve Tate was convicted of the payment of an unlawful gratuity to Evans and sentenced to two years imprisonment and a ten thousand dollar fine. 18 U.S.C.A. § 201(f). On count fifteen, charging payment of unlawful compensation to Evans, Tate was sentenced to two years imprisonment and a ten thousand dollar fine and, further, was disqualified from holding any office of honor, trust or profit under the United States. 18 U.S.C.A. § 203(b). On count sixteen, charging interstate travel in facilitation of bribery, 18 U.S.C.A. § 201, Tate was sentenced to a five year term of imprisonment and a fine of ten thousand dollars. 18 U.S.C.A. §§ 2, 1952(a)(3), 1952(b)(2). All of Tate's sentences were made concurrent.

Appellant Gent was convicted of the conspiracy charged in count one and sentenced to three years imprisonment and a fine of three thousand dollars. 18 U.S.C.A. § 371. He was acquitted of counts two through seven, charging conversion of government property. 18 U.S.C.A. § 641. On count sixteen, Gent was convicted and sentenced to three years imprisonment and a three thousand dollar fine for his interstate travel in aid of the bribery that violated 18 U.S.C.A. § 201. 18 U.S.C.A. §§ 2, 1952. Gent's sentences were imposed concurrently.

## II. THE BASIC FACTS

The underlying facts, adduced at trial, depict long, complex and involved dealings. We detail this chronology to provide an evidentiary background for our decision.[7] From prior to June 29, 1970, until February 6, 1975, the corporate defendant, CRCAP, was a collection agency whose clients were the holders of delinquent student loan contracts. About fourteen per cent of the loans assigned to CRCAP involved non-

---

7. Because this is an appeal from a judgment entered on a jury verdict of guilty, the evidence must be viewed in the light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1941).

government sources exclusively. The remainder of the loan accounts turned over to CRCAP for collection involved two federal student loan programs. About twelve percent of CRCAP's accounts involved Federally Insured Student Loans ("FISL") and about seventy-three per cent involved National Defense Student Loans, later called National Direct Student Loans ("NDSL"). CRCAP generally charged its clients a collection fee, by deducting a portion of the amount collected from each delinquent borrower before remitting collections to the educational institutions which employed the corporation's services.

The two federal loan programs are administered by the Office of Education, United States Department of Health, Education, and Welfare. FISL loans are extended primarily by commercial lenders, including banks, in accordance with government guidelines.[8] A loan which is approved by H.E.W. receives an insurance commitment from the government. If an insurance loan remains in total default for one hundred-twenty days, the lender may turn over the loan to the Office of Education, H.E.W. which pays the lender and undertakes to collect the loan from the student. In addition, the lender receives a "special allowance" from the government while the loan is outstanding. In many cases, the government also pays interest on the loan while the student is enrolled in school.

The NDSL program employs funds appropriated to H.E.W. by act of Congress. The monies are placed in a separate account, ninety per cent by H.E.W. and ten per cent by the educational institutions. Loans made with these funds must meet criteria established by Congress and H.E.W. As with the FISL loans, the government pays the interest while the borrower remains in school. The NDSL funds are a revolving fund; repaid loans are returned to the fund for use in originating additional NDSL loans. The regional office of H.E.W. may add to a school's loan funds if necessary. The NDSL funds are required to be kept separate and distinct from other funds and are subject to federal regulation. In the event that schools should close, or that the NDSL program should expire by operation of law, H.E.W. is required to conduct audits of the affected schools' loan accounts and divide the money between the Treasury of the United States and the schools according to the ratio of their contributions.

Under the NDSL program, schools are authorized to pay fees to collection agencies for recovery of delinquent loans. During the period relevant to this case, there was no similar provision under the FISL program. Although FISL lenders were not forbidden to employ private collection agencies, during the relevant period the government did not reimburse a lender for collection fees. However, beginning in 1973 and up until the time of this trial, bills had been repeatedly proposed to permit H.E.W. to assign delinquent FISL accounts to private collection agencies.[9]

Defendant-appellant Tate was the president of CRCAP. Defendant-appellant Gent began working for CRCAP in 1971 and became a vice-president in charge of sales and a stockholder in the corporation. He had previously been defendant-appellant Evans' superior at the Republic National Bank in Dallas. Evans was employed by Republic National Bank of Dallas prior to October 1, 1973, when he became an official with the Office of Education, H.E.W. His responsibilities at H.E.W. pertained to the FISL program. Severed co-defendant Foley had been acquainted with Tate for some time before he started to work for CRCAP in February of 1973.

Evans' position at Republic National Bank caused him to come into contact with institutions of higher education which used

---

**8.** The states of New Mexico and Louisiana also participate as actual lenders. CRCAP was employed by the State of New Mexico to collect FISL accounts. However, most of its clients were various schools in Texas involved with the NDSL program.

**9.** The legislation was enacted shortly after the conclusion of this trial. Act of October 12, 1976, P.L. 94–482 § 430, 90 Stat. 2081 at 2125.

a billing service of the bank for collection of student loans. In the spring of 1971, Tate began paying Evans amounts ranging from two hundred dollars to three hundred dollars each month to refer schools to CRCAP for collection of delinquent loans. The payments ceased at the end of the summer. There was evidence that the acceptance of this money by Evans contravened established bank policy.

By February of 1973, when Foley went to work at CRCAP, Tate admitted that the corporation was fifteen thousand dollars "in the hole." Tate was using his credit card to charge the expense of frequent parties attended by CRCAP employees and, occasionally, by Miller and Evans. Expenses from personal trips to Houston, Miami and the Bahamas in the summer of 1973 were also charged. The credit card bills were sent to CRCAP and were paid with company checks. In September of 1973, Evans was hired by H.E.W. to work as a collection supervisor in the FISL program. Shortly before leaving the employ of Republic National Bank to take up his new post, Evans accepted five hundred dollars. He contended at trial that Gent gave him the money; however, he had previously told F.B.I. agents that he had received the money from Tate. In November of 1973, Miller, Gent, Evans, and Tate met and discussed a trip to Las Vagas, Nevada. Miller refused to go, because he felt it would have violated standards of official conduct.

The trip to Las Vegas took place in January of 1974. Foley, Tate and Evans flew together from Dallas-Fort Worth, and Gent joined them in Las Vegas. The entire expense of the trip, including all of Evans' expenses, was paid by Tate. In the hotel in Las Vegas, Tate, in the presence of Gent and Foley, gave Evans two hundred dollars for gambling. Foley testified that he thought that the whole purpose of taking Evans to Las Vegas was to "keep him happy." In the latter part of 1973 and the first part of 1974, Tate was excited about proposals pending in Congress which would have permitted the Office of Education to contract directly with collection agencies for recovery of delinquent FISL loans. Tate had hopes of obtaining such a contract.[10]

In the spring of 1974, Miller began to receive complaints concerning the collection practices of CRCAP. At about the same time, CRCAP's clients began to complain that they were not receiving their monthly statements. A bookkeeper, hired by CRCAP in April of 1974, discovered that no financial statements had been prepared for the firm since 1973. There were also irregularities in the bookkeeping. CRCAP's expressed collection practice was that payments received from delinquent borrowers were to be reported to the client schools by the tenth day of the month following the receipt of the money. The bookkeeper discovered that the previous accountant had recorded, as revenue, all deposits received in each month, but had reported only the liabilities existing as of the twentieth day of the month in the statements sent to the client schools.[11] This practice created a payment lag, a twenty day "float," of some of the money owed to schools. The money received by CRCAP in its normal course of business was deposited in a single corporate bank account and was used to pay all the ordinary expenses of the corporation, including expenses incurred by corporate officers. By May of 1974 CRCAP was sixty thousand dollars behind in payments to colleges, due partly to Tate's travel and entertainment expenses which were paid by the corporation. CRCAP had also provided loans to employees and had paid some of their business expenses. On at least two occasions, Tate ordered that loans or advances to himself or Foley be recorded as year-end bonuses. Also, implementation costs of computer facilities were unforeseeably high.

10. See note 9, supra.

11. The predecessor accountant testified that his bookkeeping and accounting was based on information supplied by Tate. He explained that he neither provided Tate with business advice nor took part in the business decisions of the corporation. He further testified that he never hid or misrepresented any financial matter concerning the corporation to Tate.

When CRCAP could not afford to pay all of its client schools' accounts, Gent instructed the bookkeeper which schools were to be paid. Tate suggested that schools not be paid for specific student accounts, when checks received by CRCAP had been written on insufficient funds. The bookkeeper investigated one such instance and determined that the student's check had cleared the bank. Client schools that complained to CRCAP were advised only that the firm had "computer problems." They were never told that funds collected by CRCAP were not being remitted as they were received.

The bookkeeper left CRCAP in July of 1974. In August, he went to Miller's supervisor at the Office of Education and explained that CRCAP had failed to remit one hundred fifty thousand dollars to client schools. Although the bookkeeper thought that the conversation was confidential, Foley became aware of the visit and called the bookkeeper the next day to complain. Foley had learned of the visit from Gent.

Miller was assigned to investigate complaints regarding CRCAP's collections for the State of New Mexico. He was supplied with copies of files relating to student loan accounts from the University of New Mexico. While he was in Albuquerque, Miller spoke with the Director of Financial Aid at the University of Albuquerque who was a social acquaintance of Tate. Miller told her that he was conducting an investigation at the University of New Mexico concerning complaints lodged against CRCAP and that he had found no irregularities. The conversation with Miller influenced the subsequent decision of the University of Albuquerque to turn over delinquent student loan accounts to CRCAP.

In fact, however, there were considerable irregularities in the business conduct of CRCAP. Some student checks made payable to the Office of Education and mailed to CRCAP were endorsed by Miller at Tate's request, although Miller knew he was without authority to do so. Gent was present on one such occasion, and Tate paid for Miller's lunch. Other checks bore Miller's purported endorsement, although he did not sign them. Money paid to CRCAP was not forwarded to client schools. Some schools ceased to receive statements altogether. By the fall of 1974, the statements prepared by CRCAP reflected only one-fourth to one-third of the firm's collections. Tate determined which accounts were to be paid. When questioned by his accountant, Tate replied that he could cut off the statements at any point he wished. The disparity between the amounts owed to schools and the cash on hand continued to increase. Tate often asked employees to cash checks for him in amounts ranging from fifty dollars to one hundred dollars. On one occasion, an employee cashed a five hundred dollar check for Tate and took it to his office. She testified that Evans was there and Tate closed the door sharply, though she failed to correctly identify Evans at trial. She testified that afterwards, on the same day, Gent appeared angry and upset after a telephone conversation and remarked: "Why pad somebody's pocket if they can't keep their mouth shut?"

In November of 1974, Foley and two collectors left the employ of CRCAP and went to work at H.E.W. Gent also applied to H.E.W., but his application was rejected. Evans recommended both Foley and Gent. Evans, in fact, asked his secretary to type Gent's application. In December of 1974, the bookkeeper who had worked for CRCAP from April, 1974 to July, 1974, saw Miller at a party at Gent's apartment and mentioned that he had heard that Miller was assigned to investigate CRCAP. Miller replied that he knew more about CRCAP than the bookkeeper thought.

In December of 1974, the Deputy Regional Director of H.E.W. became aware of irregularities in the Guaranteed Student Loan Program and reports of preferential hiring. In January of 1975, the H.E.W. Regional Counsel received similar information, as well as complaints concerning CRCAP. The Guaranteed Student Loan Program office was closed pending investigation. Investigators could not locate the files entrusted to Miller in connection with the investigation of CRCAP activity in New

Mexico. Miller told a co-worker that he had destroyed them.

In February of 1975, the Attorney General of the State of Texas, pursuant to the state Deceptive Trade Practices Act, sought and received a temporary restraining order against CRCAP. The state court also appointed a receiver to take control of the corporation's assets. A preliminary injunction, issued on February 13, 1975, was still in effect at the time of the trial from which this appeal is taken. Clients of CRCAP were invited by the receiver to inspect the corporate records and file a claim for unremitted collections. The claims exceeded two hundred eleven thousand dollars; the corporation's assets were valued at about thirty-one thousand dollars. In February of 1975, Foley and Evans left H.E.W.; Miller was fired in June of the same year.

We evaluate appellants' legal arguments against this factual background and have grouped related arguments together.

## III. SUFFICIENCY OF THE EVIDENCE

All three appellants urge that the evidence adduced at trial was not sufficient to support the verdicts and judgments of guilt on various counts of the indictment.

Gent contends that the evidence of his guilty knowledge and intent was insufficient to support his conviction on count one. Both Gent and Tate argue that the district court erred in charging the jury, regarding count one, that certain monies were to be considered federal funds as a matter of law. They maintain that the issue was a question for the jury and that the government failed in its proof. Tate urges this same argument regarding his conviction under counts two through seven. Evans contends that the government failed to prove his culpability on count eleven because there was no proof that an "official act" was performed in exchange for the gratuity he received. Tate argues that the government failed to prove the offense in count twelve, that he paid the gratuity to Evans. Regarding his conviction under count thirteen, Evans asserts that the government impermissibly relied only upon his confession, and that there was no proof that he had the power to perform any act in exchange for the unlawful payment. Evans also contends that the verdict on count sixteen must fail because it is inconsistent with the verdict on count eleven; Gent contends that the government failed to prove his guilty knowledge and intent on that count.

### A. Gent's Participation in the Conspiracy

■ Despite his contention to the contrary, we conclude that the evidence was sufficient to prove that Gent knowingly and intentionally assumed membership in the conspiracy charged in count one.

■ "The gist of the offense of conspiracy . . . is agreement among the conspirators to commit an offense attended by an act of one or more of the conspirators to effect the object of the conspiracy." *United States v. Falcone*, 311 U.S. 205, 210, 61 S.Ct. 204, 207, 85 L.Ed. 128 (1940). *See also United States v. Isaacs*, 516 F.2d 409, 410 (5th Cir.), *cert. denied,* 423 U.S. 936, 96 S.Ct. 295, 46 L.Ed.2d 269 (1975). Since secrecy and concealment are the hallmarks of a conspiracy, the element of agreement is seldom susceptible of direct proof. Thus, the objective and observable acts of the conspirators are relevant and competent circumstantial evidence from which the jury may draw the inference of the existence of the agreement or common purpose. *Norfolk Monumental Co., Inc. v. Woodlawn Memorial Gardens, Inc.,* 394 U.S. 700, 704, 89 S.Ct. 1391, 22 L.Ed.2d 658 (1969); *United States v. Lowry,* 456 F.2d 341, 344 (5th Cir. 1972); *United States v. Warner,* 441 F.2d 821, 830 (5th Cir.), *cert. denied,* 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971). Here the jury was well-justified in finding the existence of the agreement or common purpose: first, to collect money on behalf of client schools and to fail to remit, converting a substantial portion of the money and second, to corrupt persons in positions of public trust with travel, entertainment, gifts, and cash in order to garner favorable treatment of CRCAP and discourage aggressive action on complaints involving the corporation.

The government was not compelled to prove that Gent was intimately familiar with each and every detail of the conspiracy. The critical nexus of guilt, the essential nature of the agreement and Gent's connection with it, was amply proven. *Blumenthal v. United States*, 332 U.S. 539, 557, 68 S.Ct. 248, 92 L.Ed. 154 (1947). The government's showing that Gent had knowledge of the agreement and associated with the plan to promote its success was sufficient. *Ingram v. United States*, 360 U.S. 672, 678, 79 S.Ct. 1314, 3 L.Ed.2d 1503 (1959). A minimal showing of actual knowing participation is sufficient to sustain a conspiracy conviction challenged on appeal, when the conspiracy has been adequately established by other independent evidence. *United States v. Morrow*, 537 F.2d 120, 130 (5th Cir. 1976); *United States v. McGann*, 431 F.2d 1104, 1107 (5th Cir. 1970), *cert. denied*, 401 U.S. 919, 91 S.Ct. 904, 27 L.Ed.2d 821 (1971). While mere knowledge of a conspiracy is not alone sufficient to hold an alleged coconspirator responsible as a culpable participant, Gent's actions clearly and unmistakably furthered the independently established conspiracy. Thus, on this appellate review, we need find only "slight evidence" of the guilty nexus between Gent and the conspiracy. *United States v. Bass*, 562 F.2d 967, 969 (5th Cir. 1977); *United States v. Alvarez*, 548 F.2d 542, 544 (5th Cir. 1977). However, here there is more than "slight evidence."

Appellant Gent maintains that, reading the record as a whole, there was insufficient evidence of his knowing participation. "[C]onspiracy to commit a particular substantive offense cannot exist without *at least* the degree of criminal intent necessary for the substantive offense itself." *Ingram v. United States, supra* at 678, 79 S.Ct. at 1319, *quoting*, Note, *Developments in the Law-Criminal Conspiracy*, 72 Harv.L. Rev. 920, 939 (1959). Here the evidence established that Gent had the requisite intent necessary to his conviction under count one and that he aided in the conspiracy. *See Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952); *United States v. Gallishaw*, 428 F.2d 760 (5th Cir. 1970); *Nelson v. United States*, 415 F.2d 483 (5th Cir. 1969), *cert. denied*, 396 U.S. 1060, 90 S.Ct. 751, 24 L.Ed.2d 754 (1970). Indeed, the evidence revealed that Gent was one of the major figures in the conspiracy. Although there was no dispute at trial that Gent's duties caused him to be absent from the CRCAP office much of the time, he was both an officer and a stockholder in the corporation. He had authority to post entries in the CRCAP records, and he signed or co-signed some of the checks. Gent himself admitted at trial that he was familiar with CRCAP's overall operations.

Gent was well aware that CRCAP was delinquent in its payments to client schools, and he was responsible for determining which schools were to be paid. Although he testified at trial that he was unaware until May of 1974 that CRCAP had financial problems and that he did not know until August or September of 1974 that incorrect statements were being transmitted to client schools, the jury chose to disbelieve his explanation. We cannot say that the jury's disbelief of Gent was improper. The government established, on cross-examination, that Gent had made a prior inconsistent statement suggesting an earlier awareness of the irregularities, an earlier awareness consistent with earlier notations in his appointment calendar. He also had used CRCAP funds for personal expenses.

Gent was greatly involved in CRCAP's relations with government officials. In his appointment calendar he referred to entertainment of "O.E." or "feds," and recorded expenses for entertaining Miller and Evans. Gent's sales plan for the final quarter of 1973 and the first quarter of 1974 indicated that he and Tate were planning actively to seek a contract from the Office of Education for collection of FISL accounts and that Evans would be their contact person. During this period, Evans traveled to Las Vegas at CRCAP's expense, and accepted two hundred dollars from Tate, in Gent's presence. Foley testified that the business purpose of the trip was to "keep [Evans] happy." It was within the proper scope of

the jury's function to discount Gent's explanations that he urged Evans to accept the Las Vegas trip only because of their friendship and that the suggestion of obtaining a government contract to collect FISL accounts was considered only briefly and rejected.

Gent also misused his relationship with severed co-defendant Miller for a corrupt purpose. Miller declined the invitation to join the Las Vegas excursion because he felt that acceptance of the trip would violate standards of official conduct. Nevertheless, Miller allowed CRCAP to entertain him on numerous occasions, and he endorsed checks payable to the government at the request of Tate, once when Gent was present, knowing that his endorsement exceeded his authority. Miller began to receive complaints about CRCAP as early as March of 1974. In August of 1974, having been assigned to travel to New Mexico to investigate CRCAP's activities, he and Gent discussed the impending investigation, though he knew it was improper to do so. During the New Mexico investigation, Miller discovered "cash flow" problems in CRCAP operations. Yet, during that investigation, Miller told a University of Albuquerque official that there were no irregularities; this information was influential in the school's subsequent decision to award a contract to CRCAP. Gent and Miller were very close friends. Gent had a great deal of influence with Miller, and he used it. Although he denied his own criminal intent, Miller admitted that he had permitted his relationship with Gent to interfere with the proper conduct of his office and that he had misused his position on behalf of CRCAP.

The evidence before the jury established that Gent participated significantly in the conspiracy. Gent took part in the improper conversion of funds owed to client schools. His friendship with Evans and Miller was a vehicle for the corruption of those officials for the benefit of CRCAP. Therefore, it

was reasonable and proper for the jury to conclude that Gent possessed the requisite intent to establish his culpability in the conspiracy.

### B. *The Federal Nature of the Funds*

Gent and Tate argue that the evidence was not sufficient to support their convictions on count one for conspiracy because the government failed to prove that the FISL and NDSL funds were government property. Both also argue that the district court erroneously failed to submit this issue to the jury. Tate also urges these points of error regarding his substantive convictions on counts two through seven. Title 18, United States Code, Section 641 makes it a federal offense to embezzle, steal, purloin or knowingly convert "any . . . money, or thing of value of the United States or any department or agency thereof . . ." [12] Thus, the characterization of the funds becomes critical.

Over proper and timely objection by appellants, the district court charged, on counts two through seven, that "a specific portion of the monies used in the National Defense Direct Student Loan Program are monies belonging to the United States." The district court reasoned that "the law speaks for itself and . . . it's just a question of applying the law to the instruments and the law." The defendants argued that it was "a question of fact as to whether or not there is [sic] any regulations or laws stating that these funds are federal moneys." [13] Although both Tate and Gent objected to the district court's instruction as given, neither offered any legal argument that the monies were not federal, nor did they offer any substitute at the charge conference.

 As a general proposition, when the question of ownership of property depends upon the construction or existence of a statute, it is a matter of law for the court's

---

12. *See* note 3, *supra.*

13. The issue was initially raised concerning the admissibility of a legal memorandum prepared by the regional counsel of H.E.W., based on

relevant regulations and statutes and ultimately admitted before the court, which presumedly was used to formulate the jury instruction challenged here.

determination. *United States v. Lanni*, 466 F.2d 1102, 1110 (3d Cir. 1972); *Terry v. United States*, 131 F.2d 40, 44 (8th Cir. 1942); *Thompson v. United States*, 256 F. 616, 619–20 (2d Cir.), *cert. denied*, 249 U.S. 617, 39 S.Ct. 391, 63 L.Ed. 804 (1919). On the other hand, it is an essential element of a violation of 18 U.S.C.A. § 641 that the government suffer some actual property loss. *See United States v. Collins*, 464 F.2d 1163, 1165 (9th Cir. 1972).

Although there appears to be a conflict whether a district court may properly instruct that the funds actually embezzled were of a federal character,[14] we need not reach that issue for several reasons. The foremost reason is that this case simply does not present the issue.

The district court charged that "[a] *portion of the monies used in the National Defense/Direct Student Loan Program* are monies belonging to the United States." (emphasis supplied) However, the district court further instructed the jury that an "essential element . . required to be proved beyond a reasonable doubt in order to establish the offense charged . . . [is] [t]hat *the monies in question* or any portion thereof . . . were monies belonging to the United States." (emphasis supplied) The district court made a clear distinction between the federal character of the monies generally involved in the National Defense/Direct Student Loan Program and the specific monies which were allegedly misdirected. Thus, the question of whether the specific monies that were misdirected were possessed of sufficient indicia of federal ownership to satisfy that element of the offense was left for the jury. If it is a question of fact, as appellants maintain, the fact finder decided it. If it is a question of law, the evidence supports the jury's conclusion that the misdirected monies were federal monies and the error, if any, is harmless.[15]

The district court's characterization of the NDSL funds comports with the applicable law. The decisions that have sustained findings of a sufficient federal interest in the property at issue have generally involved instances in which the government had either title to, possession of, or control over the tangible object involved. *United States v. Miller, supra* (United

14. In *United States v. Alessio*, 439 F.2d 803 (1st Cir. 1971) the district court had disallowed defense cross-examination of a witness pertaining to the issue of government ownership of the actual money stolen from the petty cash fund of a government installation. The district court specifically found that the actual money stolen was the property of the United States Government. Reversing, the United States Court of Appeals for the First Circuit observed:

The Court could properly make a ruling of law with respect to title, predicated upon findings of fact which it left to the jury. However, it is clear that the court did more. It left nothing to the jury. It made a 'finding' that the money belonged to the government, which was not only an essential element in the government's case, but depended upon an acceptance of the testimony of the government witnesses. The court cannot make a finding accepting the government's testimony, no matter how clear it may be; the burden still remained on the government to prove the money in the fund belonged to it. Testimony, though unchallenged, may still be disbelieved. As we said in *DeCecco v. United States*, 1 Cir., 1964, 338 F.2d 797, at 798, 'No matter how persuasive the government's evidence may seem to the court, there is no burden on a defendant to dispute it.' *Id.* at 804.

In a case presenting the same issue, *United States v. Miller*, 520 F.2d 1208 (9th Cir. 1975), the United States Court of Appeals for the Ninth Circuit decided that there was no error:

The appellant argues that the trial court erred in instructing the jury that the check was 'money and a thing of value of the United States,' rather than permitting the jury to resolve that issue. Whether an item is government property ordinarily is a question of law, and when the facts so establish, it is proper for the court to give such an instruction. *United States v. Jackson*, 436 F.2d 39 (9th Cir. 1970), *cert. denied*, 403 U.S. 906, 91 S.Ct. 2209, 29 L.Ed.2d 682 (1971); *United States v. Friedman*, 445 F.2d 1076, 1087 (9th Cir. 1971).

*Id.* at 1210–1211.

*Compare also United States v. Owens*, 536 F.2d 340 (10th Cir. 1976). We need not, and specifically do not, decide which approach to follow.

15. When reviewing the trial court's instructions to a jury, the reviewing court must consider the charge as a whole, and there is no harmful error if the charge in general correctly instructs, even if one portion is technically incorrect. *See, e. g., Houston v. Herring*, 562 F.2d 347 (5th Cir. 1977).

States' check); *United States v. Caverly,* 408 F.2d 1313 (3d Cir.), *cert. denied,* 396 U.S. 866, 90 S.Ct. 144, 24 L.Ed.2d 119 (1969) (books); *Fowler v. United States,* 273 F. 15 (9th Cir. 1921) (railroad cargo); *Kambiertz v. United States,* 262 F. 378 (2d Cir. 1919) (railroad cargo); *Thompson v. United States, supra* (bags of sugar); *United States v. Echevarria,* 262 F.Supp. 373 (D.P.R.1967) (nuclear research center). *See also United States v. Morris,* 541 F.2d 153 (6th Cir. 1976); *United States v. Collins, supra; Lubin v. United States,* 313 F.2d 419 (9th Cir. 1963); *Clark v. United States,* 258 F. 437 (3d Cir. 1919); *United States v. Crawford,* 52 F.Supp. 843 (E.D.Pa.1943). However, the critical factor in determining the sufficiency of the federal interest in intangible interests, such as are involved here, is the basic philosophy of ownership reflected in relevant statutes and regulations. *See generally United States v. Farrell,* 418 F.Supp. 308 (M.D.Pa.1976). The key factor involved in this determination of federal interest is the supervision and control contemplated and manifested on the part of the government. *Cf. United States v. Moore,* 427 F.2d 38 (5th Cir.), *cert. denied,* 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384 (1970); *Arbuckle v. United States,* 146 F.2d 657 (D.C.Cir. 1944); *Lowe v. United States,* 141 F.2d 1005 (5th Cir. 1944).

The statutes involved here manifest an underlying congressional intent that the Office of Education should maintain regulatory control of funds to which federal capital contributions are made.[16] The Commissioner of Education has broad authority under the statutes and regulations to determine the allocations to institutions, to reallocate funds, to approve student loans, and to control the use of the federal funds. The federal interest in the government's capital contributions to the loan funds is specifically established and preserved by the provision for termination of the program on a date certain and the requirement that the proportionate share of the balance in the special fund be returned to the government. 20 U.S.C.A. § 1087ff. Here the ultimate federal supervision and control are virtually complete. *See* 20 U.S.C.A. §§ 421–429; 1087aa–1087ff; 45 C.F.R. §§ 144.1–144.15 (1976). *See generally* H.R.Rep.No.2157, 85th Cong., 2d Sess., *reprinted in* [1958] U.S.Code Cong. & Admin.News, p. 4731; H.R.Rep.No.1145, 87th Cong., 1st Sess., *reprinted in* [1961] U.S.Code Cong. & Admin. News, p. 3350; Sen.Rep.No.673, 89th Cong., 1st Sess., *reprinted in* [1965] U.S.Code Cong. & Admin.News, p. 4027; Sen.Rep.No.1677, 89th Cong., 2d Sess., *reprinted in* [1966] U.S.Code Cong. & Admin.News, p. 3927; Sen.Rep.No.882, 94th Cong., 2d Sess., *reprinted in* [1976] U.S.Code Cong. & Admin. News, p. 4713.

 The challenged instruction, in effect, merely paraphrased 20 U.S.C.A. §§ 1087aa(c), 1087cc.[17] It is significant that

---

**16.** Statutory analysis in this area is difficult due to the myriad of interrelated, complex statutes and regulations. The legislative branch and the executive branch seem to have avoided clear and simple language in favor of the obtuse and complex.

> Thomas Jefferson recognized [the] need for clarity and simplicity in forwarding a bill establishing elementary schools with the following comment:
>
> > I should apologize perhaps for the style of this bill. I dislike the verbose & intricate style of the modern English statutes, and in our revised code I endeavor to restore it to the simple one of the ancient statutes, in such original bills as I drew in that work. I suppose the reformation has not been acceptable as it has been little followed. You however can easily correct this bill to the taste of my brother lawyers, by making

> > every other word a 'said' or 'aforesaid,' saying every thing over 2. or 3. times, so as that nobody but we of the craft can untwist the diction, and find out what it means; and that too not so plainly but that we may conscientiously divide, one half on each side.
>
> Letter from Thomas Jefferson to Joseph C. Cabell, September 9, 1817, *reprinted* in 9 The Writings of Thomas Jefferson 489 (H. Washington ed. 1854) (punctuation and spelling corrected against original in University of Virginia library).
>
> Sky, *Rulemaking and the Federal Grant Process in the United States Office of Education,* 62 Va.L.Rev. 1017, 1031 n. 31 (1976).

**17.** 20 U.S.C.A. § 1087aa provides in part:

> *Availability of appropriation for apportionment and payment of Federal capital contributions*

there was no instruction pertaining to the federal character of FISL funds and that the instruction regarding the NDSL program characterized as federal only the funds in that program. The district court did not characterize any of the student loan payments that came into the illegal possession of the defendants. Rather, the district court clearly instructed the jury that the federal character of the misdirected funds was an essential element of the embezzlement offense which the government was required to prove beyond a reasonable doubt. The two instructions were derived from the applicable statutes and were distinctly emphasized. Thus, the guilt determinative issue of fund characterization was properly decided by the jury.[18]

(c) Any sums appropriated pursuant to subsection (b) of this section for any fiscal year shall be available for apportionment pursuant to section 1087bb of this title and for payment of Federal capital contributions therefrom to institutions of higher education which have *agreements with the Commissioner* under section 1087cc of this title. Such Federal capital contributions and all contributions from such institutions shall be used for the establishment, expansion, and maintenance of student loan funds.

20 U.S.C.A. § 1087cc provides:

*Agreements with institutions of higher education—Terms and provisions*

(a) An agreement with any institution of higher education for the payment of Federal capital contributions under this part shall—

(1) provide for the establishment and maintenance of a student loan fund for the purposes of this part;

(2) provide for the deposit in such fund of—

(A) the Federal capital contributions,

(B) a capital contribution by such institution in an amount equal to not one-ninth of the amount of such Federal contributions,

(C) collections of principal and interest on student loans made from such fund,

(D) charges collected pursuant to regulations under section 1087dd(c)(1)(G) of this title, and

(E) any other earnings of the funds;

(3) provide that such student loan fund shall be used only for—

(A) loans to students, in accordance with the provisions of this part,

(B) administrative expenses, as provided in subsection (b) of this section,

(C) capital distributions, as provided in section 1087ff of this title, and

(D) costs of litigation, and other collection costs agreed to by the Commissioner in connection with the collection of a loan from the fund (and interest thereon) or a charge assessed pursuant to regulations under section 1087dd(c)(1)(G) of this title;

(4) provide that where a note or written agreement evidencing a note has been in default for (A) one hundred and twenty days, in the case of a loan which is repayable in monthly installments, or (B) one hundred and eighty days, in the case of a loan which is repayable in less frequent installments, notice of such default shall be given to the Commissioner in a report describing the total number of loans from such fund which are in such default, and made to the Commissioner *at least annually;*

(5) provide that where a note or written agreement evidencing a loan has been in default for at least 2 years despite due diligence on the part of the institution in making collection thereon, the institution may assign its rights under such note or agreement to the United States, without recompense, and that in that event any sums collected on such a loan shall be deposited in the general fund of the Treasury; and

(6) include such other provisions as may be necessary to protect the financial interest of the United States and *promote the purposes* of this part as are agreed to by the Commissioner and the institution.

*Administrative expenses*

(b) An institution which has entered into an agreement under subsection (a) of this section shall be entitled, for each fiscal year during which it makes student loans from a student loan fund established under such agreement, to a payment in lieu of reimbursement for its expenses in administering its student loan program under this part during such year. Such payment shall be made in accordance with section 1088b of this title.

18. The government contends, and we agree, that the conspiracy convictions must be affirmed even if the federal character of the funds had not been adequately proven. To sustain a conspiracy conviction, it is only necessary to prove knowledge of the conspiracy and an intentional act in furtherance of the illicit agreement. *E. g., Huff v. United States,* 301 F.2d 760, 766 (5th Cir.), *cert. denied,* 371 U.S. 922, 83 S.Ct. 289, 9 L.Ed.2d 230 (1962). Here, moreover, the conspiracy charged in count one of the indictment and proven by the evidence contemplated two objectives. The first objective involved the theft of government property. The second objective involved the corruption of government officials in violation of Title 18, United States Code, Section 201. As we have already noted, the evidence established a concerted and sustained effort by Tate

■ We also agree with the government's assertion that there was sufficient evidence to support the jury's verdict with respect to the federalness of the funds that were embezzled.[19] The evidence showed that, at any given time, approximately seventy-five percent of any NDSL account consisted of federal funds. These accounts were required to be maintained in a manner designed to ensure that the federal contribution would remain ascertainable to facilitate the interim and final accountings to the government. The evidence of the federalness of the converted funds distinguishes this case from the situation presented in *United States v. Owens*, 536 F.2d 340 (10th Cir. 1976). Gent's and Tate's reliance on *Owens* is misplaced. In *Owens* the United States Court of Appeals for the Tenth Circuit held that the evidence was insufficient to establish that the money embezzled from a municipal urban renewal authority was federal money. The government contended that the authority's funds were imbued with a sufficient federal character since federal grants were added to its coffers. The defendants contended that the grant money was no longer "money . . . of the United States" when it passed to the agency. The court, avoiding any decision on the proper construction of the term "money . . . of the United States," held that there was insufficient evidence to show that the specific money actually embezzled had a federal character. The court concluded that the record was also inadequate to establish that money received from private loans and assumedly guaranteed by the United States Government constituted federal funds because the money never belonged to the United States and the ultimate responsibility for repayment rested with the municipal agency. The critical facts in *Owens* are wholly inapposite to the facts of the instant case. Here most of the funds were initially federal monies and it is statutorily contemplated that the ultimate repayment will be to the federal government.[20] Here the monies have a federal origin and a federal end, and during their outstanding circulation they are subject to extensive federal controls. This is not the situation in which the federal monies are intended as an outright grant. *See Wheeler v. Barrera*, 417 U.S. 402, 94 S.Ct. 2274, 41 L.Ed.2d 159 (1974); *United States v. Farrell*, 418 F.Supp. 308 (M.D.Pa.1976); 20 U.S. C.A. §§ 241a–241h. In this case the jury was correct in concluding that these funds retained their federalness. *See Arbuckle v. United States, supra; Loewe v. United States*, 135 F.2d 622 (9th Cir. 1943); *United States v. Echevarria, supra.*

■ We find it unnecessary to decide the question whether funds loaned to students under the FISL program are federal funds prior to the time they are in default and the government has advanced payment under its guarantee. This record is replete with proof that Gent and Tate prevented

and Gent to provide gratuities to government officials in order to influence their official actions; the conspiracy was amply proven on that basis. Both Gent and Tate were, in fact, found guilty on count sixteen which charged interstate travel in aid of bribery. Count sixteen was expressly incorporated by reference as an overt act in furtherance of the conspiracy charged in count one. Thus, even assuming that the funds were not federal, the convictions under count one would be sustained. A single conspiracy may have several purposes; if one of its purposes is a violation of federal law, then the conspiracy itself is unlawful under federal law. *Anderson v. United States*, 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974).

19. The jury was properly instructed to determine on each of counts two through seven whether the amount converted was in excess of one hundred and fifty dollars. Thus, there can be no question regarding the degree of the offenses on which convictions were returned. 18 U.S.C.A. § 641.

20. *United States v. Collins, supra*, despite Gent's and Tate's arguments to the contrary, is consistent with the result we reach. In *Collins* the United States Court of Appeals for the Ninth Circuit, despite a vigorous dissent, expressly pretermitted the question whether the district court erred in deciding, as a matter of law, that under the contractual scheme, the United States retained title to certain funds that were transferred to the municipal treasury. The *ratio decidendi* of the *Collins* majority was simply the principle that a bank which is induced to pay a check upon a forged endorsement loses its own money and not that of its depositor.

the remission to client schools of the NDSL monies collected by CRCAP. These client schools included the educational institutions specifically named in counts two through seven. Count one charged a conspiracy. Counts two through seven involved only NDSL funds, not FISL funds. Thus, the convictions under counts two through seven may be sustained on that basis. The argument that the conspiracy convictions must be reversed for failure to prove a loss to the government on the FISL funds is thrice fatally flawed. First, as has been previously, noted, it was not necessary for the government to prove every element of every substantive offense which was an object of this multi-objective conspiracy. The conspiracy convictions are sustained on other bases and the government need not have shown a loss to the government on the FISL program. Second, the government's obligation to indemnify FISL lenders did not always remain purely executory, as appellants argue. Rather, the State of Louisiana had a contrary experience. A Louisiana state agency participated in a federal reinsurance program in which the federal government advanced eighty percent of the principal of a guaranteed student loan upon the notification of delinquency. The state agency itself then attempted to collect the loan and retained CRCAP for that purpose. The agreement between Louisiana and the federal government contemplated that if, and when, the collection efforts on the defaulted loans were successful the state agency would remit eighty percent of the funds to the federal government. This evidence established an actual loss to the federal government of the funds which CRCAP failed to remit. Third, and finally, both Gent and Tate overlook, or improperly discount, the evidence pertaining to the anticipated passage of legislation to enable H.E.W. to contract directly with private collection agencies for the collection of FISL funds. There was evidence of the appellants' ambition, desire and preliminary overtures to obtain such a contract in the event that the proposals became law. The fact that this object could not be achieved during the actual lifetime of the conspiracy

did not preclude their conviction for conspiring to convert government funds. *United States v. Winter,* 509 F.2d 975, 982 (5th Cir.), *cert. denied sub. nom., Parks v. United States,* 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975). Thus, we hold that there was ample support in the evidence regarding the NDSL funds for the convictions of Gent and Tate for conspiracy under count one, and for Tate's conviction on the substantive charges under counts two through seven.

### C. *The Bribery Counts*

In count twelve appellant Tate was charged with having given appellant Evans five hundred dollars at the time Evans left his job at the Republic National Bank of Dallas and started to work for H.E.W., in violation of 18 U.S.C.A. § 201(f). Count thirteen charged Evans with having accepted that unlawful five hundred dollar gratuity in violation of 18 U.S.C.A. § 201(g). The only probative evidence of any significance that was presented in the government's case in chief was a statement made by Evans acknowledging that he had accepted the money. At that point, Tate's name had been deleted from the statement. The jury was carefully instructed that the statement could be considered only against Evans. After Evans took the stand in his own defense, an unexpurgated version of the statement was placed before the jury which mentioned Tate by name. Both Tate and Evans moved for judgments of acquittal when the government rested; the motions were renewed at the close of all the evidence. In addition, Tate filed a post-verdict motion for a judgment of acquittal or, in the alternative, a new trial.

■ Tate did not take the stand, and presented only character evidence in his own behalf. The fact that his co-defendant testified cannot imply a waiver by Tate of his objections to the sufficiency of the evidence. *United States v. Arias-Diaz,* 497 F.2d 165, 168–69 (5th Cir. 1974), *cert. denied,* 420 U.S. 1003, 95 S.Ct. 1445, 43 L.Ed.2d 761 (1975); *Cephus v. United States,* 324 F.2d 893, 897–98 (D.C.Cir.1963).

476

He has renewed his objection on this appeal.

The test to be applied by the trial court in passing on a motion for a judgment of acquittal is whether, taking the view most favorable to the government, a reasonable minded jury could accept the relevant evidence as adequate and sufficient to support the conclusion of defendant's guilt beyond a reasonable doubt. Fed. R.Crim.P. 29(a); *United States v. Jeffords,* 491 F.2d 90, 91 (5th Cir. 1974). When the sufficiency of the evidence is attacked on appeal, the same standard must be met. *United States v. Lowry, supra; United States v. Harper,* 450 F.2d 1032, 1040 (5th Cir. 1971). When the sufficiency of the evidence is challenged in a case involving extrajudicial admissions, corroborating evidence also must be evaluated. In *Opper v. United States,* 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954), the Supreme Court held that an accused's extrajudicial admissions of essential facts or elements of the crime, made subsequent to the crime, are of the same character as confessions, and corroboration by independent evidence is required. The corroboration need not be sufficient, independent of the statements, to establish the *corpus delicti.* It is sufficient if the corroboration supports the essential admitted facts sufficiently to justify a jury inference of their truth; but those facts plus the other evidence must be sufficient to find guilt beyond a reasonable doubt. We examine appellants' contentions separately.

With respect to Tate, the government concedes that the evidence was not sufficient to withstand a motion for a judgment of acquittal. We agree. At the close of the government's case, when Tate's first motion for judgment of acquittal was time-

ly made, there was no significant evidence on which Tate's guilt under count twelve could be determined. Up to that point, his name had been deleted from Evans' statement. Thus, the motion for judgment of acquittal was well founded and should have been granted. *United States v. Arias-Diaz, supra; Cephus v. United States, supra.* The government suggests that we should apply the concurrent sentence doctrine to pretermit any decision on the sufficiency of the evidence and the concomitant motions for judgments of acquittal. We disagree and reverse Tate's conviction under count twelve.

The concurrent sentence doctrine provides that if a defendant is given concurrent sentences on several counts and a conviction on one count is sustained then the reviewing court need not consider the validity of the convictions on the other counts. *E. g., Roviaro v. United States,* 353 U.S. 53, 59 n.6, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957); *Hirabayashi v. United States,* 320 U.S. 81, 85, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943); *United States v. Crockett,* 514 F.2d 64, 74 (5th Cir. 1975). *See generally* Wright, Federal Practice and Procedure: Criminal § 527. However, the question of whether the concurrent sentence doctrine is to be applied in a given case is addressed to our judicial discretion. *United States v. Abigando,* 439 F.2d 827, 829 (5th Cir. 1971). In this case, in which several defendants were charged with a complex interrelated series of offenses, the lack of prejudice is not apparent and the possibility of adverse collateral consequences does not appear remote. Thus, we decline to exercise our discretion to ignore Tate's attack on his conviction under count twelve.[21] *See Barnes v. United States,* 412 U.S. 837, 848 n.16, 93 S.Ct. 2357, 37 L.Ed.2d 380 (1973);

---

**21.** Apparently, the concurrent sentence doctrine is applicable when, as here, multiple fines are imposed concurrently in addition to concurrent sentences of terms of years. *See United States v. Plyman,* 551 F.2d 965, 967 n.6 (5th Cir. 1977); *United States v. Hale,* 468 F.2d 435, 436 (5th Cir. 1972). Since we decline to exercise our discretion to apply the doctrine here, we need not evaluate this question on the facts before this court. We also need not decide the

intriguing question whether the concurrent sentence doctrine is still a viable facet of appellate court discretion given recent statutory and regulatory developments. *See* 18 U.S.C.A. §§ 4201–4218; 28 C.F.R. §§ 2.1–2.58 (1975). *But see, e. g., United States v. Carvin,* 555 F.2d 1303 (5th Cir. 1977); *United States v. Brown,* 555 F.2d 407 (5th Cir. 1977); *United States v. Smith,* 550 F.2d 277, 285 (5th Cir. 1977).

*Benton v. Maryland*, 395 U.S. 784, 791, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969); *United States v. Casey*, 428 F.2d 229, 232 (5th Cir.), *cert. denied*, 400 U.S. 839, 91 S.Ct. 78, 27 L.Ed.2d 73 (1970). Most significant, and dispositive, to our decision not to apply the concurrent sentence doctrine is the fact that here the government has agreed that there was not sufficient evidence on which to convict Tate under count twelve. The government admits that it has failed to meet its burden of proof on count twelve; yet, would have us apply a doctrine of appellate judicial economy to uphold the conviction. We cannot countenance such a result. The government has not affirmatively demonstrated that the likelihood of harm either in the form of collateral consequences or of prejudice in sentencing and at trial was so remote as to be insignificant on the facts. *See United States v. Binetti*, 547 F.2d 265, 269 (5th Cir.), *rev'd on other grounds*, 552 F.2d 1141 (1977); Note, *The Federal Concurrent Sentence Doctrine*, 70 Colum.L.Rev. 1099, 1117 (1970). *See generally*, Wright, Federal Practice and Procedure: Criminal § 527. Here the conviction under count twelve was not so "inextricably bound up" with the other convictions to require their invalidation. *See United States v. Plyman, supra.*

▆▆▆▆ Since *United States v. Musquiz*, 445 F.2d 963 (5th Cir. 1971), "the usual practice of this Circuit when reversing a conviction due to insufficient evidence has been to remand with directions for a new trial—*if* a motion for a new trial was made in the trial court." *Greene v. Massey*, 546 F.2d 51, 56 (5th Cir.), *cert. granted*, 432 U.S.

905, 97 S.Ct. 2949, 53 L.Ed.2d 1077 (1977) (citations therein). In *Musquiz* this Court attempted to reconcile Supreme Court case law concerning the constitutionality, under the double jeopardy clause of the Fifth Amendment, of permitting an accused to be retried after his conviction has been reversed for lack of evidence to support the verdict. *Compare Bryan v. United States*, 338 U.S. 552, 70 S.Ct. 317, 94 L.Ed. 335 (1950) *and Sapir v. United States*, 348 U.S. 373, 75 S.Ct. 422, 99 L.Ed. 426 (1955) *and Forman v. United States*, 361 U.S. 416, 80 S.Ct. 481, 4 L.Ed.2d 412 (1960). In *dictum* that has since become the general rule in this Circuit, this Court concluded that "[t]he distinction between *Bryan*, on the one hand, and *Forman* and *Sapir* on the other, seems to turn, *under the present state of the law at least*, on whether the defendant made a motion for a new trial in the district court," if such a motion was made then, a retrial is permissible. *United States v. Musquiz, supra*, 445 F.2d at 966 (emphasis supplied).[22] This approach has been re-examined recently in the context of related intervening Supreme Court pronouncements. This Court determined that "the additional scrutiny by the Supreme Court of instances when the Double Jeopardy Clause precludes appeals by the Government does not move the procedure begun with *Bryan* and adopted by our *Musquiz* decision from the shadows of uncertainty into the sunlight of clarity." *Greene v. Massey, supra*, 546 F.2d at 55 n.12. To hold, as we do, that Tate is not subject to being retried under count twelve, we need not, and do not, reach the constitutional issue.[23] We need not reach that issue

---

**22.** The Court in *Musquiz* reversed the conviction and remanded with directions to dismiss the *indictment* since the *defendant* did not move for a new trial. In all the other cased cited in *Musquiz* the convictions were reversed and no new trial was authorized. *United States v. Barfield*, 447 F.2d 85 (5th Cir. 1971); *United States v. Goodson*, 439 F.2d 1056 (5th Cir. 1971); *United States v. Johnson*, 427 F.2d 957 (5th Cir. 1970). In pre-*Musquiz* opinions the distinction of making both a motion for acquittal and a motion for a new trial was sometimes recognized, sometimes overlooked and sometimes was not made. *Greene v. Massey, supra* at 56 n.16 (citations therein).

**23.** Since *Musquiz* and its progeny are binding precedent we are precluded from redetermining the issue of whether we have the power to remand for a second trial despite the Double Jeopardy protection. "[O]ne panel of this Court does not overrule the decisions of another, much less the decisions of many others." *Malone v. Alabama*, 514 F.2d 77, 80 (5th Cir. 1975). Therefore, we must decline to enter the fray. *See generally* 8 Moore's Federal Practice § 29.09[2]; 2 Wright, Federal Practice and Procedure: Criminal § 470; Mayers & Yarbrough, *Bis Vexari: New Trials and Successive Prosecutions*, 74 Harv.L.Rev. 1 (1960); Thompson, *Reversals for Insufficient Evidence: The*

first, because we immunize Tate from a second jeopardy, and second, because we base our holding on Title 28, United States Code, Section 2106.[24] In *Greene v. Massey, supra* at 56 n.16, this Court noted:

It is important to recognize that the *Musquiz* rule is *not* a mandatory practice in all instances. The wording of § 2106 speaks in terms of ". . . such further proceedings to be had as may be *just* under the circumstances." (emphasis in original)

Since the Double Jeopardy Clause is not violated when this Court immunizes a defendant from a second trial, the section 2106 "just under the circumstances" standard permits this Court to direct that, as to Tate, count twelve of the indictment be dismissed on remand when, as here, "the prosecution has had an opportunity to fully develop its case and failed to do so or when the prosecution did fully develop its case," and it is determined that a judgment of acquittal should have been granted because of insufficient evidence to support a conviction. *Greene v. Massey, supra* at 56 n.16; *United States v. Brumley,* 560 F.2d 1268, 1277 (5th Cir. 1977), *citing, United States v. Koonce,* 485 F.2d 374, 382 (8th Cir. 1973). *See United States v. Bass,* 490 F.2d 846, 852–53 (5th Cir. 1974); *United States v. Peterson,* 488 F.2d 645, 651 n.14 (5th Cir.), *cert. denied,* 419 U.S. 828, 95 S.Ct. 49, 42 L.Ed.2d 53 (1974); *United States v. Parks,* 460 F.2d 736, 746 (5th Cir. 1972).

The issue of the sufficiency of the evidence regarding Evans is decidedly differ-

ent, and we must decide it differently. Evans did testify, and his testimony cured the deficiency in the government's case. His voluntary statement,[25] which was read to the jury, acknowledged that he had received five hundred dollars just prior to leaving his job at the Republic National Bank, at a time when the donor knew that Evans had accepted a position in the Office of Education at H.E.W. Evans also admitted, in the statement, that he had previously recommended collection agencies to educational institutions which were clients of Republic National Bank, and that he had received money in appreciation for this business relationship.

During his testimony at trial, Evans insisted that the five hundred dollar payment had been handed to him physically by Gent, rather than Tate. He admitted, however, that he knew that the money had ultimately come from Tate, as President of CRCAP.[26] We find significant corroboration of Evans' extrajudicial statement in his intrajudicial admissions which we find to be credible when considered with his acknowledgment that he had previously received payments from Tate for referring collegiate customers of the Republic National Bank to CRCAP. During the course of his testimony at trial, Evans also admitted that he believed that Tate, through these payments, was "just really trying to buy [his] friendship." He also admitted that he accepted two hundred dollars from Tate in January of 1974, although he said he was surprised to receive the money; the reason for the gift was not discussed.

*Emerging Doctrine of Appellate Acquittal,* 8 Ind.L.Rev. 497 (1975). Compare *Greene v. Massey, supra,* and *United States v. Musquiz, supra,* with *United States v. Wiley,* 170 U.S. App.D.C. 382, 517 F.2d 1212 (1975). Perhaps, a resolution of the issue is forthcoming. *United States v. Burks,* 547 F.2d 968 (6th Cir.), *cert. granted,* 431 U.S. 964, 97 S.Ct. 2919, 53 L.Ed.2d 1059 (1977); *Greene v. Massey, supra.*

24. 28 U.S.C.A. § 2106 provides:
Determination
The Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and *may remand the*

cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances. (emphasis supplied)

25. Although the voluntariness was challenged at trial, that issue is not raised on this appeal. Brief of Appellant Evans at 13.

26. Evans testified that the investigative agents to whom he had made a prior statement failed to correct it although he claimed he had commented that it was inaccurate with respect to the identity of the donor. The agents, called in rebuttal, denied that Evans had claimed the money came from Gent, rather than Tate.

■ These facts, when considered in the context of the entire transcript, permitted the jury to infer Evans' guilty knowledge with respect to count thirteen. The corroborating evidence, as a whole, cured any supposed deficiency in the government's proof that Evans received an unlawful gratuity from Tate, as charged in count thirteen.[27] Evans has argued that the district court committed error in denying his motions for judgments of acquittal, made at the conclusion of the government's case and at the close of all the evidence, regarding count thirteen. We must affirm the denial of the two motions. Initially, Evans' decision to take the stand was a waiver of his objection to the denial of his motion for a judgment of acquittal made at the conclusion of the government's evidence: "[W]e adhere to the well established, albeit criticized, rule in the Fifth Circuit that when a defendant puts on evidence in his behalf after making a motion for acquittal under F.R.Crim.P. 29(a) he waives objection to the denial of that motion . . ." (footnotes omitted) *United States v. Perez,* 526 F.2d 859, 863 (5th Cir. 1976) (citations therein). *See also, e. g., United States v. Phipps,* 543 F.2d 576, 577 (5th Cir. 1976); *United States v. Edwards,* 488 F.2d 1154, 1158 (5th Cir. 1974). Secondly, the denial of Evans' motion for judgment of acquittal at the close of all the evidence was proper since there was substantial evidence in the record as a whole to support the jury finding of guilt. *United States v. Lowry, supra; United States v. Harper, supra; United States v. Jackson,* 444 F.2d 1389, 1389–90 (5th Cir. 1971).

### D. The Unlawful Gratuity

We find no merit in Evans' argument that his conviction under counts eleven, thirteen and fourteen must be reversed because the government failed to prove that the money and compensation were received for an actual "official act." Evans misapprehends the essential elements of the crimes for which he has been convicted under these counts. 18 U.S.C.A. §§ 201(g), 203(a).[28] Evans sets up the proverbial "straw man" by searching the record for some evidence of *quid pro quo:* some evidence of an "official act," either in fact or the then present capability, on his part directly corresponding to the payment by Tate. He knocks the "straw man" down by pointing to the absence of such evidence. Based on our understanding of the law and knowledge of the record on appeal, we conclude that Evans makes much ado about nothing.

■ Evans makes much of the lack of any evidence that he actually performed an "official act" for Tate in his position with H.E.W. He contends that he committed no offense because his duties were related to the FISL program, not the NDSL program, and that it was thus impossible for an "official act" to flow from Evans to Tate in return for the payment from Tate to Evans. However, the statutes upon which Evans' convictions under counts eleven, thirteen and fourteen are based, in general, prohibit the acceptance by a government official of any extraneous compensation or thing of value for official conduct. More specifically, it is not necessary that the official actually engage in identifiable conduct or misconduct nor that any specific *quid pro quo* be contemplated by the parties nor even that the official actually be capable of providing some official act as *quid pro quo* at the time.

---

**27.** *See McGautha v. California,* 402 U.S. 183, 215–16, 91 S.Ct. 1454, 1471, 28 L.Ed.2d 711 (1971):

Further, a defendant whose motion for acquittal at the close of the Government's case is denied must decide whether to stand on his motion or put on a defense, with the risk that in so doing he will bolster the Government case enough for it to support a verdict of guilty. *E. g., United States v. Calderon,* 348 U.S. 160, 164 and n.1 [, 75 S.Ct. 186, 99 L.Ed.

202] (1954); *2C Wright, Federal Practice and Procedure* § 463 (1969); cf. American Bar Association, Project on Standards for Criminal Justice, Trial by Jury 107–108 (Approved Draft, 1968). But see Comment, The Motion for Acquittal: A Neglected Safeguard, 70 Yale L.J. 1151 (1961); cf. *Cephus v. United States,* 117 U.S.App.D.C. 15, 324 F.2d 893 (1963).

**28.** *See notes 3 and 5, supra.*

■ As a prefatory premise, we note that both the conflict of interest statute, 18 U.S.C.A. § 203, and the unlawful gratuity statute, 18 U.S.C.A. § 201, must be broadly construed in order to accomplish the legislative purpose which they manifest.[29] *See United States v. Anderson,* 509 F.2d 312, 333 (D.C.Cir.1974), *cert. denied,* 420 U.S. 991, 95 S.Ct. 1427, 43 L.Ed.2d 672 (1975); *Parks v. United States,* 355 F.2d 167, 168 (5th Cir. 1965).

■ The purpose of these statutes is to reach any situation in which the judgment of a government agent might be clouded because of payments or gifts made to him by reason of his position "otherwise than as provided by law for the proper discharge of official duty." Even if corruption is not intended by either the donor or the donee, there is still a tendency in such a situation to provide conscious or unconscious preferential treatment of the donor by the donee, or the inefficient management of public affairs. These statutes, like the predecessor legislation, are a congressional effort to eliminate the temptation inherent in such a situation:

> Congress proceeded evidently in recognition of the principle that "No man can serve two masters," and that it was not right that an officer should agree to accept fees for doing services in matters where the United States is interested, before any officer of the government. The performance of duty by an officer is compensated by the salary or fees regularly allowed by law. To permit agreements for other compensation for services, to be paid by those interested in

matters before government officers, would be to countenance the rendering of services oftentimes inconsistent with fidelity to the best interests of the government, to which the employé owes his first and highest obligation. *United States v. Booth,* 148 F. 112, 116 (D.Or.1906).

*See also Burton v. United States,* 202 U.S. 344, 368, 26 S.Ct. 688, 50 L.Ed. 1057 (1906); *United States v. Jacobs,* 431 F.2d 754, 759 (2d Cir. 1970), *cert. denied,* 402 U.S. 950, 91 S.Ct. 1613, 29 L.Ed.2d 120; *United States v. Irwin,* 354 F.2d 192, 196 (2d Cir. 1965), *cert. denied,* 383 U.S. 967, 86 S.Ct. 1272, 16 L.Ed.2d 308 (1966).

■ In evaluating his argument regarding intent, we focus specifically on Evans' mental state, for the giving and receiving of an unlawful gratuity are not interdependent offenses; the donee's intent may differ from the donor's. *See generally United States v. Anderson, supra; United States v. Miller,* 340 F.2d 421 (4th Cir. 1965). The requisite intent necessary to sustain a conviction for bribery is that the official accept a thing of value "corruptly." However, under the unlawful gratuity subsection all that need be proven is that the official accepted, because of his position, a thing of value "otherwise than as provided by law for the proper discharge of official duty." Compare 18 U.S.C.A. § 201(c) *with* 18 U.S.C.A. § 201(g). Thus, § 201(g) makes it criminal for a public official to accept a thing of value to which he is not lawfully entitled, regardless of the intent of the donor or donee. There was sufficient evidence that Evans accepted the things of value "knowingly and purposefully and not

---

**29.** In the 1962 consolidation and codification of the various related statutes, the Congress sought to approve and preserve the courts' broad construction of these statutory provisions:

> Insofar as the conflict-of-interest laws are concerned, the bill has two purposes. First, it would simplify and strengthen the conflict laws presently in effect. . . .
> A secondary feature of the bill is the substitution of a single comprehensive section of the Criminal Code for a number of existing statutes concerned with bribery. This consolidation would make no significant changes of substance and, more particularly, would

not restrict the broad scope of the present bribery statutes as construed by the courts.

. . . . .

> The necessity for maintaining high ethical standards of behavior in the Government becomes greater as its activities become more complex and bring it into closer and closer contact with the private sector of the Nation's economy. Sen.Rep.No.2213, 87th Cong., 2d Sess., *reprinted in* [1962] U.S.Code Cong. & Admin.News, pp. 3852–53.

*See also, Wilson v. United States,* 230 F.2d 521, 524 (4th Cir.), *cert. denied,* 351 U.S. 931, 76 S.Ct. 789, 100 L.Ed. 1460 (1956); *Hurley v. United States,* 192 F.2d 297, 300 (4th Cir. 1951).

through accident, misunderstanding, inadvertence or other innocent reasons." *United States v. Irwin, supra* at 197.

Specific intent is not an element of either § 201(g) or § 203(a). *See United States v. Podell,* 519 F.2d 144 (2d Cir.), *cert. denied,* 423 U.S. 926, 96 S.Ct. 270, 46 L.Ed.2d 252 (1975); *United States v. Barash,* 365 F.2d 395, 402 (2d Cir. 1966); *United States v. Kenner,* 354 F.2d 780, 785 (2d Cir. 1965), *cert. denied,* 383 U.S. 958, 86 S.Ct. 1223, 16 L.Ed.2d 301 (1965). *Cf. United States v. Quinn,* 141 F.Supp. 622, 627 (S.D. N.Y.1956). The gravamen of each offense, then, is not an intent to be corrupted or influenced, but simply the acceptance of an unauthorized compensation. *See United States v. Brewster,* 506 F.2d 62, 72–74 n.26 (D.C. Cir.1974); [30] *United States v. Umans,* 368 F.2d 725, 728–30 (2d Cir. 1966), *cert. dismissed,* 389 U.S. 80, 88 S.Ct. 253, 19 L.Ed.2d 255 (1967); *United States v. Irwin, supra. Cf. United States v. Forgione,* 487 F.2d 364, 365 (1st Cir. 1973), *cert. denied,* 415 U.S. 976, 94 S.Ct. 1561, 39 L.Ed.2d 872 (1974); *May v. United States,* 84 U.S.App. D.C. 233, 175 F.2d 994, *cert. denied,* 338 U.S. 830, 70 S.Ct. 58, 94 L.Ed. 505 (1949).

Evans is also incorrect in asserting that the government was required to prove that the unlawful compensation was earmarked for a particular matter then pending before Evans and over which he had authority. Neither the ability to perform nor the actual performance of some identifiable official act as *quid pro quo* is necessary for a violation of these statutes. *See, e. g., United States v. Jacobs, supra; United States v. Miller,* 340 F.2d 421 (4th Cir. 1965); *United States v. Hall,* 245 F.2d 338 (2d Cir. 1957). Certainly, these statutes reach improper attempts to influence the future course of official conduct. *See, e. g., United States v. Brewster, supra; United States v. Johnson,* 337 F.2d 180, 196 (4th Cir. 1964), *aff'd,* 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966). Furthermore, it is immaterial that the donee-official's position is ministerial or subordinate, or even that he actually lacks the authority to perform an act to benefit the donor. *E. g., United States v. Birdsall,* 233 U.S. 223, 34 S.Ct. 512, 58 L.Ed. 930 (1914); *United States v. Jacobs, supra; United States v. Miller,* 340 F.2d 421 (4th Cir. 1965); *United States v. Hall, supra.*[31]

The evidence here amply supports the jury's guilty verdict on counts eleven, thirteen and fourteen. Counts eleven and fourteen charged the unlawful acceptance by Evans of a payment of two hundred dollars and other compensation, including an airline ticket and expenses, in January of 1974. During this period Gent and Tate were actively trying to keep Evans "happy" while they contemplated seeking a government contract to collect FISL loans when, and if, Congress passed enabling legislation. The payment charged in count thirteen occurred as Evans was about to assume his duties at H.E.W., in October of 1973. Although his responsibilities in the Guaranteed Student Loan Program included review and supervision of only FISL programs, the State of New Mexico administered one such program and had a contract with CRCAP for the collection of delinquent loans.[32] The evidence also showed that Evans was a strong advocate of the hiring by H.E.W. of former CRCAP employees. He had his staff help prepare job

---

**30.** We need not determine what type of intent would have been necessary had Evans been an elected public official.

**31.** Evans' reliance upon *Blunden v. United States,* 169 F.2d 991 (6th Cir. 1948), is misplaced since the reasoning of that case has been expressly disapproved by this Court. The official's lack of actual decision making authority is of no moment. *United States v. Pipkin,* 243 F.2d 491, 492 (5th Cir. 1957); *Parks v. United States, supra* at 167. *See also Wilson v. United States, supra.* We agree with the government's characterization of the other authorities cited by Evans as "inapposite." The offense in *Woelfel v. United States,* 237 F.2d 484 (4th Cir. 1956), required proof of a specific intent. In *In re Yee Gee,* 83 F. 145 (D.Wash. 1897), the court concluded that the government had not proven that the donee was a public official.

**32.** The State of New Mexico account was very significant since it had the highest default rate in the United States of any lender in its class.

applications for Foley and Gent, and lent money to another ex-employee of CRCAP to repay a delinquent student loan. The jury was well justified in concluding that Evans accepted the money and favors with knowledge that the payments were made because of his official position.

### E. The Travel Act Violations

■■■■ Evans and Gent also attack their convictions for violations of 18 U.S.C.A. § 1952, which makes interstate or foreign travel or transportation in aid of racketeering enterprises illegal.[33] Count sixteen charged that Tate and Evans, aided and abetted by Gent and Foley, had used a commercial airline flight in interstate commerce to facilitate bribery and attempted bribery in violation of 18 U.S.C.A. § 201. Gent maintains that the evidence was insufficient to show that he aided and abetted the commission of an offense. It is true that "[m]ere association with a criminal, standing alone, is not enough to convict, nor is mere presence at the scene of a crime, with nothing more, evidence that one is an aider and abetter." *United States v. Martinez,* 555 F.2d 1269, 1271 (5th Cir. 1977); *United States v. Joiner,* 429 F.2d 489, 493 (5th Cir. 1970).

> In order to aid and abet another to commit a crime it is necessary that a defendant "in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed."

*Nye & Nissen Corp. v. United States,* 336 U.S. 613, 619, 69 S.Ct. 766, 769, 93 L.Ed. 919 (1948), *quoting, United States v. Peoni,* 100 F.2d 401, 402 (2d Cir. 1938). We conclude that there was ample evidence of Gent's purposive participation to sustain the jury's conclusion that he assisted with the requisite criminal intent.[34] Gent himself admitted that he had been instrumental in encouraging Evans to accept the Las Vegas trip which took place at the same time Gent and Tate were contemplating obtaining Evans' assistance in procuring a government contract for FISL collections, in the event of the passage of proposed legislation. This congruence, in the context of his "overall participation in the criminal venture" established on the record as a whole, provided sufficient circumstantial evidence of Gent's *mens rea. See United States v. Martinez, supra,* 555 F.2d at 1271–72.

■■ We likewise find no merit in Evans' challenge to his conviction under count sixteen, which he urges is fatally inconsistent with the jury's verdict on count eleven. Regarding count eleven, Evans was not exonerated of all wrongdoing during the Las Vegas trip, but was found guilty of accepting an unlawful gratuity in violation of 18 U.S.C.A. § 201(g). Count sixteen charged that the purpose of the interstate travel to Las Vegas was "bribery and attempted bribery" in violation of 18 U.S.C.A. § 201, without mention of a specific subsection. Thus, there was no logical inconsistency.[35]

---

**33.** *See* note 6, *supra.*

**34.** In order to have been convicted of aiding and abetting, Gent must have been found to possess the same criminal intent as the actual perpetrators. *United States v. Jackson,* 526 F.2d 1236, 1238 (5th Cir. 1976). That requisite intent has already been discussed, above.

**35.** Even had there been a *logical* inconsistency, there would not be a *legal* inconsistency in the convictions since each verdict was independently supported by the evidence:

> With respect to the inconsistency of the jury's verdict, it is well established that inconsistent verdicts on a multi-count indictment do not per se invalidate a jury's findings. As Mr. Justice Holmes wrote in *Dunn v. United States,* 284 U.S. 390, 393, 52 S.Ct.

189, 190, 76 L.Ed. 356 (1932), '[c]onsistency in the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment.' Thus, as a general proposition, if a jury has convicted a defendant on one count of an indictment, and the government has adduced evidence legally sufficient to convict the defendant on that count, then whatever the jury did with the remaining counts is immaterial to the appellate inquiry. And this is no less true in a situation where there is a logical inconsistency when the jury's findings on all the counts of the indictment are considered as a whole. *See, e. g., United States v. Stiglets,* 463 F.2d 242 (5th Cir. 1972).

*United States v. Fuiman,* 546 F.2d 1155, 1157–58 (5th Cir. 1977).

## IV. SUFFICIENCY OF THE INDICTMENT

Gent alone contends that the indictment was so vague and ambiguous that it failed adequately to apprise him of the conspiracy offense with which he was charged.[36] He argues that the indictment falls short of the requirement that it be sufficiently detailed that the accused can plead former jeopardy if he is later charged with some other offense arising out of the same facts. *United States v. Tallant,* 547 F.2d 1291 (5th Cir. 1977); *Hermansen v. United States,* 228 F.2d 495 (5th Cir.), *cert. denied,* 351 U.S. 924, 76 S.Ct. 781, 100 L.Ed. 1455 (1956). We disagree.

■ A conspiracy indictment is sufficient if it sets out the essential elements of the charge and lists overt acts committed in furtherance of the conspiracy. *Anderson v. United States, supra,* 417 U.S. at 227 n.13, 94 S.Ct. 2253; *United States v. Scallion,* 533 F.2d 903, 911 (5th Cir. 1976). The elements of the offense are an unlawful agreement and the commission of at least one overt act by at least one of the conspirators. 18 U.S.C.A. § 371.[37] As we have noted, the conspiracy, rather than the accomplishment of its underlying objectives, is the gravamen of the offense. Therefore, it is not necessary that the object of the conspiracy be described in the detail which would be required to charge a violation of the substantive offense. *United States v. Fischetti,* 450 F.2d 34, 40 (5th Cir.), *cert. denied,* 405 U.S. 1016, 92 S.Ct. 1290, 31 L.Ed.2d 478 (1971) (citations therein).

■ The conspiracy charged in this case was described in great detail. The indictment set forth the duration of the conspiracy, the names of the participants, two objects which were violations of federal law and extensive background information, including the names of sixty-three schools from which federal funds were allegedly embezzled before February 6, 1975. The conspiracy charge alleged, in specific terms, the commission of twenty-six overt acts, including the offenses charged in the fifteen substantive counts of the indictment. Gent was named in thirteen of the overt acts, including various substantive counts. Additional factual detail was properly made available to Gent through the government's compliance with his partially granted motion for a bill of particulars. *See United States v. Debrow,* 346 U.S. 374, 378, 74 S.Ct. 113, 98 L.Ed. 92 (1953). Gent does not contend, nor could he successfully contend, that there was error in the court's denial of the motion insofar as it pertained to evidentiary detail and matter otherwise available through discovery. *United States v. Perez,* 489 F.2d 51, 70–71 (5th Cir. 1973), *cert. denied,* 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974). We must conclude that the conspiracy count of the indictment, read with the whole indictment, was sufficiently particularized to inform Gent of the offense and apprise him of the charge he faced. *See United States v. London,* 550 F.2d 206 (5th Cir. 1977); *United States v. Beasley,* 550 F.2d 261 (5th Cir. 1977); *United States v. Markham,* 537 F.2d 187, 193 (5th Cir. 1976).

## V. THE EVIDENTIARY RULINGS

All three appellants raise issues relating to the admissibility of evidence introduced at trial. Evans contends that the government was improperly permitted to show "extraneous offenses." Gent and Tate contend that various items of evidence obtained by the federal government pursuant to a grand jury subpoena were illegally seized and ought to have been suppressed. Additionally, they challenge the district court's rulings admitting documents pursuant to the business records exception to the hearsay rule and permitting a government agent to summarize and analyze transactions shown in those records.

---

**36.** Gent's motions to dismiss the indictment specifically attacked only count one, the conspiracy count. He does not attack his conviction under count sixteen for insufficiencies in the indictment. Although a pretrial motion urged a failure to state an offense, that issue is conceptually and procedurally distinct and we need not reach it, as it has not been raised here.

**37.** *See note 3, supra.*

## A. *Evidence of Extraneous Acts*

Evans asserts that it was error for the government to be permitted to adduce evidence in its case in chief showing that he had received money from CRCAP during 1971, while he was employed by the Republic National Bank. Evans' acceptance of the prior payments was established by introducing his 1971 amended tax return and his voluntary statements to federal officers. Evans, however, somewhat mischaracterizes this evidence as pertaining to "extraneous offenses" and errs in his insistence that the evidence was immaterial to the jury's consideration of the offenses charged in the indictment.

The government theorized, and Evans admitted in his testimony, that the money which he received from CRCAP while in the employ of the bank consisted of referral fees, paid in return for his recommendation of CRCAP's services to educational institutions which were clients of the bank. Evans contends, and the government agrees, that these payments were not unlawful; although no laws were violated, there was some disputed evidence that the payments contravened official bank policy. The fact that these payments were not unlawful does not, in and of itself, determine the issue. Both the traditional common law rule and Fed.R.Evid. 404(b)[38] permit a district court to admit evidence of other "acts," as well as other "crimes," for the limited legitimate purpose of proving knowledge or intent. *See, e. g., United States v. Maestas, supra; United States v. Simmons,* 503 F.2d 831, 834 (5th Cir. 1974); *United States v. Scanland,* 495 F.2d 1104, 1108 (5th Cir. 1974).[39]

Although we are not convinced that the district court abused its discretion in admitting this evidence, *see United States v. Brown,* 547 F.2d 1264, 1266 (5th Cir. 1977); *United States v. Bloom,* 538 F.2d 704, 709 (5th Cir. 1976), we need not reach the question because even if the admission were error, the conviction would still be upheld since even the improper admission of such evidence may be cured by appropriate limiting instructions. *United States v. Bloom, supra* at 710. *See Driver v. United States,* 441 F.2d 276 (5th Cir. 1971); *McBride v. United States,* 409 F.2d 1046, 1048 (10th Cir.), *cert. dismissed,* 396 U.S. 938, 90 S.Ct. 282, 24 L.Ed.2d 240 (1969). Generally, when evaluating the impact of jury instructions, they must be construed in the context of all the judge's instructions in the case and not in an isolated or piecemeal fashion. *United States v. Bloom, supra* at 710. *See, e. g., Bolden v. Kansas City Southern Railway Co.,* 468 F.2d 580, 581 (5th Cir. 1972); *Troutman v. Southern Railway Co.,* 441 F.2d 586, 590 (5th Cir.), *cert. denied,* 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971). In this total context, the district judge's instructions made it clear that the evidence of the similar extraneous acts could be considered, if indeed it was con-

---

**38.** Fed.R.Evid. 404 provides in part:

(b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Given our disposition, we need not determine the extent to which, if any, this rule alters the common law doctrine that had previously developed. *See United States v. Brown,* 548 F.2d 1194, 1206–07 (5th Cir. 1977); *United States v. Maestas,* 546 F.2d 1177, 1180–81 (5th Cir. 1977). Of course, evidence admissible under Fed.R.Evid. 404(b) must also satisfy the requirements of Fed.R.Evid. 403, which provides:

*Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time*
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Following our reasoning, the result that we reach cannot be affected by the present precedential problems in this area or their ultimate resolutions. *See United States v. Beechum,* 555 F.2d 487 (5th Cir.), *petition for rehearing granted,* 563 F.2d 782 (1977).

**39.** Given the reasoning we follow to our result here, we need not decide how *United States v. Simmons, supra,* alters the applicable law. *See United States v. Beechum, supra* at 501–02.

sidered at all, for the limited purpose countenanced by the common law rule and codified in Fed.R.Evid. 404(b). The district judge narrowly restricted the jury's consideration of this evidence, instructing that the similar extrinsic acts could not be considered evidence that an act charged in the indictment was committed, but could be considered only for the purpose of showing the intent or state of mind with which a charged act was committed, after the jury found beyond a reasonable doubt that the charged act was committed. The district judge made clear in his instructions, moreover, that the jury was not, in any event, obliged to draw an inference from the prior, similar acts.[40]

### B. *The Suppression Motion*

Appellant Tate filed a motion to suppress "any and all" items obtained as a result of an alleged "search and seizure" of CRCAP's offices on February 6, 1975. Appellant Gent subsequently moved to adopt all pleadings filed on behalf of his co-defendants, on the ground that the government's allegations were the same regarding all defendants.

Prior to trial, a hearing was conducted upon Tate's motion. An Assistant Attorney General for the State of Texas, employed in the Consumer Protection Division of that office, testified that he had commenced an action on February 6, 1975, in a district court of the State of Texas, on behalf of the state. The District Attorney for Dallas County joined in the proceeding. The action was commenced pursuant to the Texas Deceptive Trade Practices, Consumer Protection Act, Tex.Bus. & Comm.Code §§ 17.-41 *et seq.* The state district judge, after an *ex parte* hearing on the state's complaint and acting without notice, issued a temporary restraining order and appointed a receiver to take possession of the records and assets of CRCAP. The receiver was autho-

rized by the court's order to take possession of all business records and business property of Tate and CRCAP.

The temporary restraining order was served upon Tate at the CRCAP office on February 6, 1975, by a deputy constable for Dallas County. On the same day, the appointed receiver took his oath, posted the bond required by the order, and proceeded to the CRCAP offices, where he took possession of the records and property of the company. At his request, the appointed receiver was accompanied by representatives of the Texas Attorney General and the District Attorney. At the receiver's suggestion, Tate called his attorney, who arrived a short time later. The receiver hired a security service to prevent the removal of documents, and later transferred the records to an accountant employed to assist him. All interested parties were permitted access to the documents, and Tate was permitted to segregate and remove documents which he claimed were his personal property. Government investigators, including federal agents, were allowed access to the records during the receivership. On March 5, 1976, nearly thirteen months after the issuance of the preliminary injunction following the adversary hearing that was held on February 13, 1975, the appointed receiver was served with a subpoena duces tecum for the production of all of CRCAP's records for a federal grand jury investigation. He directed his accountant to comply with the subpoena. Appellants Tate and Gent rest their claim of illegality, not on the grand jury subpoena of March 5, 1976, or the right of the receiver to comply with it, but on the initial seizure of CRCAP's records pursuant to the temporary restraining order on February 6, 1975.[41] Their claim, in essence, is that the federal government was improperly permitted to make derivative use of illegally seized property.

---

**40.** Alternatively, even had there been error in the admission of evidence of these similar extrinsic acts, in view of the overwhelming evidence of Evans' guilt the error would have been harmless. *United States v. Roland*, 449 F.2d 1281, 1282 (5th Cir. 1971); *Driver v. United*

States, supra. Cf. *United States v. Bell*, 535 F.2d 886 (5th Cir. 1976).

**41.** Cf. *United States v. Dionisio*, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1972).

The initial inquiry must be whether Gent and Tate have standing to complain. Gent clearly does not. His motion to adopt his co-defendants' pleadings did not specifically refer to the suppression motion and, further, alleged no facts which would tend to show that his rights were violated by the seizure. Merely the fact that he would be aggrieved by the introduction of the evidence at trial was insufficient to state a claim under the Fourth Amendment. *Alderman v. United States*, 394 U.S. 165, 171–172, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). Gent was not on the premises of CRCAP at the time of the search; he asserted no interest in the premises; [42] and, he was not charged with a possessory offense. Gent failed to establish his independent possessory or proprietary interest. Therefore, he was without standing to assert any claim of illegality of the seizure, whether or not he had owned any of the records, even though he had "adopted" Tate's motion. *Brown v. United States*, 411 U.S. 223, 229, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973); *United States v. Smith*, 550 F.2d 277, 283 (5th Cir. 1977).

The issue of Tate's standing is presented in a substantially different posture. He claims to have standing as CRCAP's *alter ego*. We need not agree in order to reach the merits of Tate's claim. Only a "person aggrieved" by an unlawful search and seizure may move for suppression of evidence thus obtained. Fed.R. Crim.P. 41. Tate does not have standing to challenge the legality of the search and seizure merely because he was a corporate officer. *United States v. Britt*, 508 F.2d 1052 (5th Cir.), *cert. denied*, 423 U.S. 825, 96 S.Ct. 40, 46 L.Ed.2d 42 (1975). Since we conclude that Tate has standing on an alternative theory, we need not determine whether he was, in fact, the *alter ego* of CRCAP. *See G. M. Leasing Corp. v. United States*, 429 U.S. 338, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977). *Compare United States v. Britt, supra, with Henzel v. United States*, 296 F.2d 650 (5th Cir. 1961). The temporary restraining order of the Texas court was directed at Tate as well as CRCAP. Therefore, we deem it proper to consider the seizure to have been directed at him as well and to assume, for the purpose of this argument, his standing to contest the search. *Henzel v. United States, supra.*

Nothing in Tate's suppression motion itself or the evidence he produced at the hearing demonstrates any illegality in the seizure of the CRCAP records. The burden is on the movant to make specific factual allegations of illegality, to produce evidence, and to persuade the court that the evidence should be suppressed. *See, e. g., United States v. De La Fuente*, 548 F.2d 528 (5th Cir. 1977); *Rogers v. United States*, 330 F.2d 535 (5th Cir.), *cert. denied*, 379 U.S. 916, 85 S.Ct. 265, 13 L.Ed.2d 186 (1964). That burden was simply not met here. Tate's motion alleged nothing more than that a warrantless search had occurred at the CRCAP office pursuant to a state civil action; [43] that the search was illegal; and that evidence produced as a result of the search should be suppressed.

Appellant Tate *now* claims that the state civil proceedings were merely a sham to obtain evidence for his federal criminal prosecution. He notes that there were discussions between state and federal representatives prior to the commencement of the civil action; that federal investigators were permitted access to documents shortly after the commencement of the receivership; and that documents were subpoenaed subsequently by a federal grand jury. It is doubtful that these allegations would have

---

**42.** Gent himself testified that he had surrendered his CRCAP stock in 1974.

**43.** The search was not "warrantless," at all, in the sense of lacking a determination by a magistrate. The temporary restraining order issued by the state district court, incorporating findings of fact after an *ex parte* hearing, afforded Tate safeguards as full as those provided by the process of obtaining a warrant. *Cf. Coolidge v. New Hampshire*, 403 U.S. 443, 449–53, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). The question, in any event, is not whether a warrant could have been obtained, but whether the intrusion was reasonable. *Cooper v. California*, 386 U.S. 58, 61, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967).

been sufficient even to require a hearing. *See United States v. Hickok*, 481 F.2d 377, 379 (9th Cir. 1973). There is nothing wrong, *per se*, in cooperation by state and federal agencies. *See United States v. Sellers*, 483 F.2d 37 (5th Cir. 1973), *cert. denied*, 417 U.S. 908, 94 S.Ct. 2604, 41 L.Ed.2d 212 (1974).

Nor has there been any showing of irregularity in the state civil proceedings. Tate insinuates that there was impropriety in that the proceedings were begun *ex parte*, without notice, and that the Texas Attorney General's office was assisted by the District Attorney. Texas law, however, provides that the action shall be *ex parte* and without notice. Tex.Bus. & Comm. Code § 17.47(a). District Attorneys are expressly charged with a duty to render such assistance when requested by the consumer protection division of the office of the Attorney General. Tex.Bus. & Comm.Code § 17.48(a).

The record conclusively refutes Tate's contention that the civil action was a sham or an abuse of discovery. Discovery, of course, was not the expressed purpose for the Texas proceedings. The state injunction proceedings were nothing more than a transfer of control of CRCAP and of possession of its property by a state court in response to a judicially-perceived emergency. It was fully contemplated and provided for in state law. Thus, the cases upon which Tate relies are inapposite.[44] He has simply failed in his proof.

■ Nor was the state proceeding a sham. The receivership was still in effect at the time of trial, pursuant to a preliminary injunction issued by the state court. The receiver marshalled the CRCAP property, employed an accountant to analyze and maintain the company's records, and sought claims from the creditors of the corporation. Many such claims were filed. There was no evidence adduced which suggested that the civil action was instituted at the request of the federal government, and a Texas Assistant District Attorney involved in the civil action testified at trial that the federal government was not given prior notice of the injunction proceedings. Appellate Tate's collateral attack on the receivership proceedings must fail. The appropriate action was for appellants and CRCAP to seek redress in the state courts. *See Peel v. United States*, 316 F.2d 907, 911 (5th Cir.), *cert. denied sub nom., Crane v. United States*, 375 U.S. 896, 84 S.Ct. 174, 11 L.Ed.2d 125 (1963). They did appeal in the state courts on the issue of appointment of the receiver, and the Texas court affirmed the action of the state district judge. *Collegiate Recovery & Credit Assistance Programs, Inc. v. State*, 525 S.W.2d 900 (Tex. Civ.App.1975). Therefore, we find no merit in the suppression claim.

### C. The Admission of CRCAP Records

■ Gent contends that the district court erred in admitting into evidence, over defense objection, government exhibit C–81, a series of pocket-size appointment calendars known as "daytimers." He contends that the exhibits were improperly identified as business records admissible pursuant to Rule 803(6), Federal Rules of Evidence and that the government failed to comply with Rule 803(24), Federal Rules of Evidence by not supplying Gent with copies of the daytimers in advance of trial. At the outset, it is interesting to note that here, for all intents and purposes, the "declarants" are objecting to the introduction of the so-called "hearsay." This is an ironic twist in that the rule against hearsay has as its primary purpose the protection of the right of litigants to confront witnesses against them and to test their credibility through cross-examination. *Colorificio Italiano Max Meyer, S.P.A. v. S/S Hellenic Wave*, 419

---

**44.** *Hicks v. IRS*, 470 F.2d 87 (1st Cir. 1972); *United States v. Bowman*, 435 F.2d 467 (3d Cir. 1970); *McSurely v. McClellan*, 138 U.S.App. D.C. 187, 426 F.2d 664 (D.C.Cir.1970); *United States v. Detroit Vital Foods, Inc.*, 407 F.2d 570 (6th Cir. 1969), *rev'd sub. nom., United States v. Kordel*, 397 U.S. 1, 90 S.Ct. 763, 25 L.Ed.2d 1 (1970); *Silver v. McCamey*, 95 U.S.App.D.C. 318, 221 F.2d 873 (D.C.Cir.1955); *United States v. Rand*, 308 F.Supp. 1231 (N.D.Ohio 1970); *United States v. Parrott*, 248 F.Supp. 196 (D.D. C.1965).

F.2d 223, 224 (5th Cir. 1969). This unique situation certainly colors our consideration of these claims. *See* Fed.R.Evid. 102.

There is some support in the record for the government's proposition, accepted by the district court, that the daytimers were made and maintained as business records of CRCAP and, as such, were admissible under Rule 803(6).[45] The entries purport on their face to list Gent's business entertainment expenses. Foley identified the daytimers as having been maintained by Gent in Gent's handwriting; he also testified that such documents were used as a matter of company policy. *See United States v. Jones,* 554 F.2d 251 (5th Cir. 1977). Even aside from this testimony, there is a compelling reason why the daytimers were admissible. The entries were, in fact, statements made by Gent himself and offered against him. Thus, they were not hearsay at all under Rule 801(d)(2)(A), Federal Rules of Evidence.[46] Any and all statements of an accused person, so far as are not excluded by the doctrine of confessions or by the privilege against self-incrimination, are usable against the accused as admissions and are not hearsay. *United States v. Archbold-Newball,* 554 F.2d 664,

676 (5th Cir. 1977); *United States v. Rouse,* 452 F.2d 311, 313–14 (5th Cir. 1971). *See also United States v. Scholle,* 553 F.2d 1109 (8th Cir. 1977). In addition, we note that the statements in the daytimers tended to promote and further the conspiracy of which both Gent and Tate were proved to be members. Consequently, the statements were admissible against Tate as well under Rule 801(d)(2)(E), Federal Rules of Evidence.[47] *United States v. Archbold-Newball, supra* 554 F.2d at 676; *United States v. Hicks,* 524 F.2d 1001, 1002–03 (5th Cir. 1975), *cert. denied,* 424 U.S. 946, 96 S.Ct. 1729, 48 L.Ed.2d 197 (1976). *Cf. Dutton v. Evans,* 400 U.S. 74, 80–83, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970). Thus, we conclude that the "daytimers" were admissible in evidence against both Gent and Tate. Since they were admissible, it is immaterial to this reviewing court and harmless to these defendants that the trial court's particular rationale for admitting them into evidence does not stand close scrutiny. *United States v. Britt, supra,* 508 F.2d at 1054–55. *See United States v. Bacall,* 443 F.2d 1050 (9th Cir.), *cert. denied,* 404 U.S. 1004, 92 S.Ct. 565, 30 L.Ed.2d 557 (1971); *Lawton v. Dacey,* 352 F.2d 61 (1st Cir. 1965).

**45.** Fed.R.Evid. 802 makes hearsay inadmissible, except as otherwise provided by the rules. Fed.R.Evid. 803 provides, in part:

*Hearsay Exceptions; Availability of Declarant Immaterial*

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . . .

(6) *Records of regularly conducted activity.* A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The terms "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

**46.** Fed.R.Evid. 801 provides, in part:

*Definitions*

The following definitions apply under this article:

(a) *Statement.* A "statement" is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by him as an assertion.

(b) *Declarant.* A "declarant" is a person who makes a statement.

(c) *Hearsay.* "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

(d) *Statements which are not hearsay.* A statement is not hearsay if—

. . . . .

(2) *Admission by party-opponent.* The statement is offered against a party and is (A) his own statement, in either his individual or a representative capacity or . . . (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

**47.** *See* note 46, *supra.*

■■■ Appellant Gent also complains that the government should have been barred from introducing the daytimers, because he was not provided with copies of them prior to trial. He purportedly relies on Rule 803(24), Federal Rules of Evidence.[48] This assertion fails for two reasons. First, by its own terms, Rule 803(24) applies to hearsay evidence which is not made admissible by a specific exception to the hearsay rule yet possesses sufficient indicia of reliability to warrant its admission upon proper notice; we have already concluded that this evidence was not hearsay. Second, the Rule refers to *notice,* not *copies.* Gent clearly had prior notice both of the existence of the exhibit and the government's intention to introduce it. The numbered exhibit stickers on the box containing the daytimers and on the first volume of the daytimers bear the initials of one of Gent's attorneys and a date more than two weeks prior to the commencement of trial, indicating that counsel had access to government exhibits C–81 and C–81a and actually examined them. Appellant Gent's counsel also referred to the exhibit by number at a pretrial motion hearing and indicated that it had been shown to him in discovery proceedings. The notice requirement of Rule 803(24) is intended to afford the party against whom the statement is offered sufficient opportunity to determine its trustworthiness in order to provide a fair opportunity to meet the statement. It must be interpreted flexibly, with this underlying policy in mind. Despite the denied motion for a continuance in order to further examine the evidence, these defendants had ample notice and access before the trial. In fact, they took advantage of the opportunity, as has already been shown. Also, since Gent was the author of the contents of the exhibit, he was in a unique position to evaluate its trustworthiness. It seems inconceivable that he could have been surprised or improperly prejudiced by its admission. Therefore, Gent's assertion of a lack of proper notice is simply not supported by these facts, even assuming that the residual hearsay exception of Rule 803(24) did apply. *See United States v. Leslie,* 542 F.2d 285, 291 (5th Cir. 1976); *United States v. Iaconetti,* 540 F.2d 574, 578 (2d Cir. 1976); *Ark-Mo Farms, Inc. v. United States,* 530 F.2d 1384, 1385–87, 209 Ct.Cl. 116 (1976).

Gent and Tate also assert that virtually all of the government's thousands of documentary exhibits were inadmissible because they were not business records. Some of the records complained of were not business records at all, but were properly introduced through witnesses who prepared them and had personal knowledge of their contents. Others, admitted only for the purpose of showing that statements were made and not for their truth, were not hearsay. Fed. R.Evid. 801(c). In some cases, objections were not properly articulated as being grounded on failure to show a proper predicate and cannot be raised here, absent clear error. *See United States v. Fendley,* 522 F.2d 181, 185–86 (5th Cir. 1975). Thus, appellants' present contention that the court wantonly admitted business records without the proper predicate is, at the very least, overbroad.

■■■ Large quantities of exhibits were admitted as business records, however,

---

48. Fed.R.Evid. 803 provides in part:
*Hearsay Exceptions; Availability of Declarant Immaterial*
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . . .

(24) *Other exceptions.* A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.

and the lengthy portions of the transcript appellants quote in their briefs demonstrate the district court's determination to comply with the dictates of the rules of evidence in admitting them. Business records are admissible in judicial proceedings pursuant to Rule 803(6), Federal Rules of Evidence, provided that certain requirements are met.[49] It must be established that the records were kept according to a regular procedure and for a routine business purpose tending to insure accuracy, and that the records not consist merely of cumulations of hearsay or uninformed opinion. The trial court is vested with a broad discretion to determine the admissibility of the records, and its ruling may not be disturbed in the absence of an abuse of discretion. *United States v. Fendley, supra* at 184–85; *United States v. Miller,* 500 F.2d 751, 754 (5th Cir. 1974), *rev'd on other grounds,* 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976); *United States v. Middlebrooks,* 431 F.2d 299, 302 (5th Cir. 1970), *cert. denied,* 400 U.S. 1009, 91 S.Ct. 569, 27 L.Ed.2d 622 (1971). No such abuse has been demonstrated in this case. The government repeatedly laid proper predicates, through competent witnesses, for the admission of business records.[50]

■■■ The government produced not just one person who was familiar with CRCAP's record-keeping system, but five, including severed co-defendant Foley. All of these individuals had done accounting and/or bookkeeping or had prepared financial statements for the company and had used the company's records in performing those duties. The various periods of their association with CRCAP encompassed the entire period beginning in August of 1971, and ending in December of 1974. This was almost the entire term of the events charged in the indictment. Of course, it is not necessary that a sponsoring witness be employed by the business at the time of the making of each record. *See United States v. Scallion, supra* 533 F.2d at 914–15. The witness must only be in a position to attest to its authenticity. *See United States v. Martin,* 434 F.2d 275, 279 (5th Cir. 1970). Each of these sponsoring witnesses testified in some detail regarding the record-keeping processes of CRCAP. All five of the witnesses, of course, were available for *voir dire* and cross-examination regarding their familiarity with the records and the degree of reliance placed upon such records by the company. Further objections, relating to the identity or competency of the actual preparer, may have been relevant to the evidentiary weight or credibility of the documents, but did not effect their admissibility. *See United States v. Gremillion,* 464 F.2d 901, 907 (5th Cir.), *cert. denied,* 409 U.S. 1085, 93 S.Ct. 683, 34 L.Ed.2d 672 (1972).

■■■ Appellants also contend that it was error to permit the government to introduce large groups of exhibits at once, instead of presenting each separately and allowing counsel an opportunity to object at that time. However, there were also objections at the trial to the piecemeal introduction of exhibits. In a complex case of this magnitude, involving thousands of exhibits, the district court has considerable latitude in expediting the proceedings. *Gordon v. United States,* 438 F.2d 858, 862–63 (5th Cir.), *cert. denied sub nom., Crandall v. United States,* 404 U.S. 828, 92 S.Ct. 63, 30 L.Ed.2d 56 (1971). The procedures adopted here were not unfair. When the district court admitted long series of exhibits together, it was repeatedly done with the provision that any specific objection which defense counsel desired to raise at a later time regarding a particular exhibit would be entertained. Such objections were rarely made. The defense had been afforded extensive discovery of government exhibits in advance of trial. Moreover, as we have already noted, this case does not present the usual situation, in which business records

---

**49.** See note 45, *supra.*

**50.** Appellants point out instances in the record which show that the government had some difficulty eliciting information to establish the proper predicate. However, these passages indicate that the district court was diligent in evaluating the admissibility of evidence under Fed.R.Evid. 803(6).

are offered against one who is a stranger to the enterprise. Both Gent and Tate were in a unique position to challenge the trustworthiness of any exhibit admitted as a business record. The district court acted well within its discretion to ensure the orderliness of the trial.

 It is also readily apparent that the actual contents of very few of the exhibits were brought to the jury's attention. Long series of documents were offered, admitted, and never mentioned again. Only exhibits expressly requested by the jury were given to them during their deliberations. The jurors requested some government charts, the admission of which is not now claimed as error. The jurors also requested the daytimers and sales plans prepared by Gent which, as we have shown, were admissible against Gent as his own statements and against Tate as statements of a coconspirator in furtherance of the conspiracy. The computer printouts requested by the jury were fully authenticated. Contrary to the implication in appellants' argument, this Court has rejected the notion that such printouts are inherently unreliable. *United States v. Fendley, supra,* 522 F.2d at 187. The prosecution in this case elicited detailed information regarding the manner in which information was transmitted to the computer, and the witnesses testified that the two computer companies used by CRCAP did accurate work based on the information submitted to them. It is clear, in any event, that there was not a hearsay impediment to the admission of this evidence, because it was not offered to prove that the amounts shown on the statements were the amounts actually owed by CRCAP clients. In fact, the testimony showed that CRCAP personnel knowingly submitted incomplete information to the computer. Therefore, it was not hearsay. Fed.R.Evid. 801(c).[51] *See Anderson v. United States, supra* 417 U.S. at 219–20, 94 S.Ct. 2253; *United States v. Carter,* 491 F.2d 625, 628 (5th Cir. 1974).

The only other evidence requested by the jury consisted of CRCAP deposit records and a record book containing red dots and dashes. The deposit records were properly authenticated by a competent witness; and, the elaborate dot and dash system of failing to remit collections was fully explained by a witness who had personal knowledge of the code and the method by which it was used to defraud client schools of CRCAP.

 In any trial of this magnitude and complexity, it is almost inevitable that some error will creep in, despite all efforts to prevent it. A defendant is not entitled to a perfect trial, but only a fair one. *Lutwak v. United States,* 344 U.S. 604, 619, 73 S.Ct. 481, 97 L.Ed. 593 (1953). Appellants received a fair trial in this case. If any evidence was introduced which should not have been admitted, it represented an insignificant portion of an enormous quantity of evidence. The errors could not have influenced the jury's verdict, and are, therefore, harmless. *Kotteakos v. United States,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

### D. *The Summary Testimony*

 Finally, appellants Gent and Tate contend that the district court erred in permitting the government case agent, a Special Agent of the F.B.I., to testify regarding his analysis of some of the evidence. The obvious answer to this is that appellants have mischaracterized the nature of this testimony. The evidence did not consist of data compilations by the F.B.I. Special Agent, but was a summarization of evidence admitted at trial. All of the information referred to in his testimony was before the jury in the form of documentary exhibits and/or testimony of other witnesses pertaining to specific events. Appellants are acutely aware that the documentary evidence in this case was voluminous. We have already noted that they were provided with complete access to all the documents prior to trial. If the evidence was already introduced, then it was certainly "produced in court." In fact, during the course of the trial the appellants were furnished with

**51.** *See* note 46, *supra.*

copies of critical documents upon request. The record also establishes that the court properly charged the jury that the charts and summaries were not evidence, and their purpose was merely explanatory. The jury was instructed to disregard any summaries not comporting with the evidence. There was no error in the procedure followed. Rule 803(8), Federal Rules of Evidence, on which appellants rely, is wholly inapplicable.[52] Rather, his testimony was admissible pursuant to Rule 1006, Federal Rules of Evidence, which provides that summaries of voluminous documents may be presented, provided that the documents themselves are made available to opposing parties.[53] *United States v. Smyth,* 556 F.2d 1179, 1184–85 (5th Cir. 1977); *Gordon v. United States, supra,* 438 F.2d at 876–77 (citations therein). *See McDaniel v. United States,* 343 F.2d 785, 788–89 (5th Cir.), *cert. denied,* 382 U.S. 826, 86 S.Ct. 59, 15 L.Ed.2d 71 (1965); *New Amsterdam Gas Co. v. W.D. Felder Co., Inc.,* 214 F.2d 825, 828–29 (5th Cir. 1954).

## VI. CONCLUSION

In summary, Tate's conviction under count twelve of the indictment is REVERSED and is REMANDED with instructions to the district court to DISMISS that count of the indictment; all the appellants' convictions under all the other counts of the indictment must be, and are, AFFIRMED.

**52.** Fed.R.Evid. 803 provides, in part:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

 . . . . .

(8) *Public records and reports.* Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, *excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel,* or (C) in civil actions and proceedings and *against the Government in criminal cases, factual findings resulting from* an *investigation made pursuant to authority granted by law,* unless the sources of infor-

mation or other circumstances indicate lack of trustworthiness. (emphasis supplied by appellants)

We need not, and expressly do not, discuss the effect of the last phrase: "unless the sources of information or other circumstances indicate lack of trustworthiness."

**53.** Fed.R.Evid. 1006 provides:

*Summaries*

The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.